# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

April 25, 2024

The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

**Re: United States v. Trevor Bickford, 23 Cr. 91 (PKC)**

Dear Judge Castel:

In December 2023, as twenty-year-old Trevor Bickford walked by a fellow inmate's cell at the MDC and noticed him lying in a pool of blood, he responded instinctively.  Remembering his life-saving training from the Civil Air Patrol, he applied pressure to the wound, called for help, and instructed other inmates to find a guard.  It was only days later when he finally saw the injured inmate getting escorted to the Suicide Unit that Mr. Bickford realized he was still alive. For the first time since he committed an unprovoked attack on three police officers tasked with safeguarding the public, he felt, that maybe his life still might have purpose.

As is clear from his guilty plea and letter to the Court, Mr. Bickford is ashamed and appalled by his actions in trying to kill three police officers. He is grateful that their training and quick response in subduing him prevented him from causing any further injury to the officers or bystanders. The officers' actions were heroic and they have been properly recognized for their bravery. Mr. Bickford must be punished for his serious crime. But we ask the Court to take into account the following mitigating factors: (1) the significant role Mr. Bickford's untreated mental illness played in his offense; (2) the low likelihood of recidivism given his current treatment, (3) Mr. Bickford's youth and (4) his demonstrated rehabilitation.

Three well-respected experts with extensive backgrounds in terrorism-related cases have opined that Mr. Bickford's actions on December 31, 2022 were not the result of radicalization or extremism, but a product of ongoing auditory, tactile, and visual hallucinations.  It was just mere months before the instant offense that Mr. Bickford experienced his first hallucinations, which guided his decision-making until he was finally able to obtain medication and intensive mental health treatment.  Once he received appropriate treatment, the hallucinations decreased, he understood the depths of his illness, and he was deeply remorseful for his conduct.  Given the unique circumstances of this case, the defense respectfully requests a sentence of 120 months to be followed by fifteen years of supervised release.

## **Mr. Bickford was Raised in a Chaotic and Dysfunctional Family Environment Which Likely Contributed to his Mental Illness.**

Trevor Thomas Bickford was born on July 28, 2003 in York, Maine to Audra Simpson and Thomas Bickford.  Mr. Bickford – the middle child of three – was known as the mediator of the family; "the boy who helped solve all his brothers' conflicts."  Letters of Support, attached as Exhibit E, at 1 (Audra Simpson's letter).  Mr. Bickford, along with his older brother, Devin, and younger brother, ███ was raised in the small community of Wells, Maine where the maternal side of his family also lived.

His mother, who worked as a waitress at a local diner, and his father, who worked as a UPS driver, struggled financially while raising their three sons.  Although the children's basic needs of food and shelter were met, home life was a frightening experience for Mr. Bickford.  His father was an alcoholic and cocaine addict who created a volatile and violent home environment where "[t]here was never a calm day – every day was a fight."  Report of Erik Mercer, L.C.S.W., attached as Exhibit C, at 2.  Physical abuse, especially towards Mr. Bickford's eldest brother, Devin, as well as emotional abuse was rampant.  Mr. Bickford remembered one occasion where his father beat Devin so badly that he vomited.  His ongoing fears that his father might kill one of his brothers would result in frequent childhood night terrors.  *Id.*  Although Mr. Bickford himself was not often on the receiving end of his father's physical abuse, he nonetheless lived in constant fear:  Mr. Bickford recalled an occasion where his father forced him "to kneel and stare at the wall for up to six hours and threatened him with violence if he were to move."  *Id.*

The violence Mr. Bickford and his brothers experienced at home was also well known to the community.  Mr. Bickford's longtime friend, Danny Marquis, recalls that Mr. Bickford's home life was "scary" as his "emotionally abusive" father "would just stomp in screaming" and "curse and threaten violence" even when the family had visitors.  Ex. C at 2; Ex. E at 17.  As the boys' wrestling coach, their father would be "toxic" and, at times, violent during their wrestling matches, resulting in his frequent expulsion.  Ex. C at 3.  Shane Maxon, a former wrestling local coach, remembered an instance where their father "grabbed [Mr. Bickford] by the throat when he lost," which led to Mr. Maxon removing his son from the team to ensure he would no longer be coached in this environment.  *Id.*  Other fathers of team members tried to intervene as he was "too hard on his kids."  *Id.*  The father's obsession with his sons' wrestling careers permeated the home as well, forcing the children, who had minimal interest in wrestling, to maintain highly restrictive diets as young as nine years old.  *Id.* at 2.  The boys recalled being "starved" and forced to vomit after eating to ensure they made their weight class.  *Id.* at 3.

2

 

As many children of abusive parents do, Mr. Bickford "tried to be on [his] best behavior all the time." Ex. C at 2. He read books as a form of escapism. *Id.* Although he wanted to explore the fields of robotics, math, and music, his father forbade him from doing so as he wanted Mr. Bickford to focus all his energies on wrestling. *Id.* at 3. At school, away from his father, Mr. Bickford gained a temporary respite. There, he excelled in all subjects, especially math, leading to his placement in the National Honor Society and the gifted and talented program. *Id.* Mr. Bickford also took an interest in the Air Force and joined the Civil Air Patrol program in Sanford, Maine. He hoped his completion of the program might lead to an advanced rank upon enlistment to the Air Force. Once a week for two years, Mr. Bickford trained with the Civil Air Patrol and learned how to fly a plane. *Id.*; Ex. E at 1. Mr. Bickford comes from a family of veterans. Both his grandparents were in the Navy. His older brother Devin is an active member of the military, recently stationed in Europe. Ex. E at 5 (Devin Bickford's Letter). His younger brother ██ is also planning to enlist once he graduates high school. As his "Aunt" Jennifer MacNeil recalls, "Trevor looked up to his grandparents and often spoke of following in their footsteps." Ex. E at 8-9 (Jennifer MacNeil's letter).

 

Because Mr. Bickford's mother worked the evening shift at the diner, Mr. Bickford's father was tasked with much of the child rearing. Ex. C at 4. Upon returning home from work, his

mother would go directly to her room and would not intervene even when their father was abusive towards their children. *Id.* Mr. Bickford's friend, Danny Marquis, describes his mother as "cold and distant" to her children. *Id.*   The only memories Mr. Bickford had of his mother becoming emotional were when she drank alcohol, which soon progressed into a daily habit.  PSR at ¶ 92.

### Mr. Bickford's Parents' Divorce and his Father's Sudden Death Likely Contributed to the Onset of Psychosis.

After twenty years together, on Mr. Bickford's fourteenth birthday, his mother made the decision to leave her marriage when she discovered her husband's infidelity with a local parent. PSR at ¶90.  As Wells was a particularly small community, the affair was common knowledge, which brought a lot of shame and embarrassment to the family.  *Id.*  In addition to the infidelity, his father became increasingly confrontational.   Concerned for her safety, his mother fled the home with the children in fear and sought a protective order.

After several weeks, with the protective order against her husband in place, Mr. Bickford, his brothers, and mother returned to their home. However, even with the protective order, Mr. Bickford still did not feel safe as his father would appear without warning at the home intoxicated, asking for forgiveness. Although Mr. Bickford's mother and brothers refused to communicate with him, Mr. Bickford, the "peacekeeper of the family," answered his calls and texts. Ex. E at 5 (Devin Bickford's letter).  Mr. Bickford's father would send him daily text messages and voicemails, expressing that he would be suicidal if it were not for Mr. Bickford's willingness to maintain contact with him. Ex. C at 5. Finally, it became too much and Mr. Bickford decided to ignore his father's repeated voicemails and text messages asking Mr. Bickford "to pick up" his phone and asking him "to come to his apartment." *Id.*; Ex. E at 9 (Jennifer MacNeil's letter).  After only three days without responding to his father, Mr. Bickford received the news that his father had died.[1] Ex. C at 5.

Mr. Bickford blamed himself for his father's death.  He believed that he "was responsible" for his father's death "because [he] never called him back" – a belief that he only recently learned was incorrect.  Ex. C at 5; Ex. E at 9 (Jennifer MacNeil's letter).  At no point did Mr. Bickford's mother or any other adult in the family dispel the notion that his father's death was a suicide and was, instead, an accidental overdose.  *Id.*; PSR at ¶ 93. To the contrary, rumors of his father's "suicide" within the small community only served to reinforce his false narrative of blame. Ex. C at 5.  Without help to manage his grief and guilt, Mr. Bickford descended into a deep depression and began using alcohol to numb his pain.  Ex. C at 6.

Soon after, Ms. Simpson began dating Anthony "Tony" Simpson – a friend of their now deceased father.  Just four months after Mr. Bickford's father's death, Mr. Simpson, moved into the family home.  Ex. C at 6; Ex. E at 9 (Jennifer MacNeil's letter).  Devin, the eldest brother,

---

[1] Thomas Kimo Bickford, Obituary, https://www.bibberfuneral.com/memorials/thomas-bickford/3438890 /obituary.php.

recalled that Mr. Simpson "ignored him and his brothers and demonstrated no interest in developing relationships with them." Ex. C at 6. In response, Devin left the family home and moved in with his grandparents nearby. *Id.*; Ex. E at 9 (Jennifer MacNeil's letter). Similarly, ███████ who was only twelve years old at the time, retreated to his bedroom – rarely leaving – and stopped communicating altogether. Ex. C at 6. Eight months after their father's death, their grandfather died. Ex. E at 2, 9 (Audra Simpson and Jennifer MacNeil's letters).[2] Not long after his grandfather's death, Mr. Bickford's grandmother was then diagnosed with cancer and, eventually, passed away on New Year's Eve 2020. Ex. E at 2, 9 (Audra Simpson and Jennifer MacNeil's letters). According to Ms. MacNeil, "[t]hese deaths shattered Trevor" and made it all the more challenging for Ms. Simpson to parent her children without the help of their grandparents. Ex. E at 9 (Jennifer MacNeil's letter).

While Mr. Bickford was experiencing these losses, he sought the company of his new girlfriend, Emma Kondor. Ex. C at 6. Much of the relationship with Ms. Kondor revolved around alcohol as the two were drinking approximately eight drinks a day together without parental intervention. *Id.* Once the COVID-19 pandemic began, Mr. Bickford's drinking intensified, and he began smoking marijuana at home alone in quarantine. *Id.* Eventually, Mr. Bickford's grades began dropping significantly, which concerned his family as their star student was now barely functioning. *Id.*

Recognizing that Mr. Bickford was struggling with depression and binge drinking, Ms. Simpson sent him to Outward Bound – a three-week program in Costa Rica and Panama where he learned to scuba dive. Ex. C at 7. Although his depression lifted temporarily while he spent time in the outdoors with other teens, as soon as he returned home the grim reality of his life at home led him into an even deeper depression. During this time, Mr. Bickford began self-mutilating and carved a large X on his chest as it seemed as though it "was the only way he could feel" something. *Id.* As Ms. Simpson recalled, Mr. Bickford "crawled into bed after Costa Rica and basically didn't come out for a year." *Id.*

Ms. Simpson, concerned for her son's mental health, enlisted the assistance of Jeannin Thibodeau, L.C.S.W., a social worker, to evaluate Mr. Bickford. Ex. A at 11.



Ex. A at 11-12. In December 2021, Mr. Bickford, who was no longer attending classes, officially dropped out of high school and stopped participating in any sports. Ex. C at 7; Ex. E at 18 (Daniel Marquis' letter).

---

[2] James L. Bickford, Obituary, https://www.bibberfuneral.com/memorials/james-bickford/3650914/obituary.php.

Mr. Bickford's depression and isolation deepened.  His friend, Daniel, recalls that after Mr. Bickford stopped attending school and wrestling, he almost never talked to him.  Ex. E at 18 (Daniel Marquis' letter).  Mr. Bickford's mental health only worsened upon the end of his relationship with his long-time girlfriend, Emma, and the suicide of his wrestling teammate, Trent, in June 2022.  Ex. E at 18, 20 (Daniel Marquis & Michael Ducharme's letters).  As Mr. Bickford was still processing the deaths of his father and grandparents, Trent's death took a significant toll on him and only furthered the withdrawal and depression he was already experiencing.  Ex. A at 12.

### Mr. Bickford Began Experiencing Psychotic Symptoms Just Months Before His Attack on the Officers.

In Spring 2022, Mr. Bickford experienced his first psychotic symptom – "a sensation that his soul was being ripped from his body," causing an experience of "pure joy." Ex. C at 7.  Joy was then followed by instability, irritability, and depression.  *Id.*; Ex. A at 6, 12.  Visual, tactile, and auditory hallucinations continued emerging and took a variety of forms, including "visions of a hooded or shadowy figure" out of the corner of his eye, "tingling sensations in his hands and lips," a "feeling that there was a leech on his face," and "popping sounds in his ears." Ex. A at 12.  Mr. Bickford believed the popping sounds were caused by the "djinn" – "a type of mystical spirit that can interfere with humans and cast spells on them" – which would govern his decision-making.  *Id.* at 7, 12.  A popping in his right ear "indicate[d] a correct decision or choice," while a popping in the left ear meant the opposite.  *Id.* at 12.  Similarly, the movements of the leech on his face would also be indicative of whether Mr. Bickford made a correct or incorrect decision.  *Id.*  Mr. Bickford, however, would try to dispel the djinn by performing "ruqyah" – "an Islamic ritual to chase bad spirits" – which would lead to popping sounds in his left ear, "indicating that he is going against the will of the djinn." *Id.*  At other times, when Mr. Bickford ignored the djinn, he reported experiencing a sharp pain in his chest.  *Id.*

During this time, Mr. Bickford, who was "seeking solace after his father's death and other losses," began exploring different religions.  Ex. A at 6.  He purchased a Bible, Buddhist texts, and a Koran.  *Id.*  Upon opening the Koran, Mr. Bickford heard a loud pop in his ears accompanied by tactile hallucination – his tongue tingling – indicating "that Islam was right for him." *Id.*  Mr. Bickford's obsession with the religion grew quickly and informally as he "researched Islam on his own," and created new or different restrictions for himself on a daily basis, such as, not watching television, not listening to music, and "not living with anyone who was not Muslim." *Id.*  According to Ms. Simpson, he even changed "his manner of speaking." Ex. C at 8. In August 2022, Mr. Bickford made a profession of faith and began attending mosques weekly and began praying obsessively for hours every day.  Ex. A at 6.

Mr. Bickford's erratic behavior took various forms.  At the same time as he obsessed over his religious rituals, Mr. Bickford also grew obsessive over the prospect of becoming a commercial scuba diver.  Ex. C at 8.  He researched diving schools throughout the country and decided that he would attend school in Seattle.  *Id.*  Ms. Simpson arranged for her son's attendance at the school

and was excited that Mr. Bickford saw a future diving career for himself. *Id.* Upon arriving in Seattle in September 2022, however, Mr. Bickford became preoccupied with sensory experiences, such as Seattle's air quality and the smell of cigarette smoke. *Id.* After one week, Mr. Bickford abruptly left the diving program because the tingling in his hands and legs while he prayed was a sign that he should leave the program as "he did not know how he could pray if he was underwater." Ex. A at 6.

Ms. Simpson was furious that Mr. Bickford had returned home so quickly from the program she had worked so hard to secure for him and kicked him out of their home. Ex. C at 8. He then moved in with his maternal grandmother and great grandmother. *Id.* There, Mr. Bickford immersed himself even deeper into online religious instruction and did not attempt to find work, but rather prayed all day. *Id.*; Ex. A at 7. Mr. Bickford would frequently watch YouTube videos about Islam, which he "believed [] the content was directed at him personally" – a typical "psychiatric symptom" that is consistent with "ideas or delusions of reference." Ex. A at 6; Ex. C at 8. As he watched the videos, Mr. Bickford would experience tingling in his lips and fingers, which he interpreted to mean that he was watching the right content. Ex. A at 6. In addition to watching videos, Mr. Bickford attended mosques in New Hampshire and Maine and would do, what he described as "optional prayers," for five to six hours a day. *Id.* at 7.

In November 2022, Mr. Bickford began having delusions of grandiosity as he had a vision of a "beautiful cloud structure," which he believed to be the "Gates of Heaven" opening for him, indicating that "he was a very important person spiritually." Ex. A at 7-8. This led him to believe that he might be "Isa" (i.e. Jesus), or the Mahdi – "a Final Leader who will appear at the End Times to herald the return of Mohammad, Is[a] (Jesus), and signal the reign of Islam throughout the world." *Id.* at 7. Eventually, Mr. Bickford believed that he was the "father of the Mahdi" and "considered changing his name to reflect this." *Id.*

Mr. Bickford's delusions of his status in Islam informed his future plans. He wanted to "help Muslims around the world" by "traveling to Afghanistan via India to ask the Taliban to help him raise an army to stop the persecution of the Rohingya." Ex. A at 7. He also talked about going to Kashmir, China, Afghanistan, Jordan, and Saudi Arabia while "ignor[ing] the impracticality and improbability of an American teenager" protecting Muslims worldwide with the assistance of the Taliban. *Id.*; Ex. B at 4.

At the end of November 2022, Mr. Bickford began watching videos about and reading literature by Muhammad al Maqdisi. Ex A. at 7; Ex. C at 8. Upon opening his book, "Millat Ibrahim," Mr. Bickford's "right ear popped louder than it had ever popped before, indicating that this was the path to follow." Ex. A at 7. This experience led Mr. Bickford to begin "living as a monk, praying for hours a day and reading the Koran," while adopting a strict diet that he maintained daily, leading to the loss of a significant amount of weight. Ex. A at 7. These self-created rules of the Islamic faith that Mr. Bickford imposed on himself were restrictive. For example, he had come to believe that he could not make eye contact with women outside of his

7

family and that his faith required him to move out of his grandmother's house into a tent in the woods as he could not live with non-Muslims.

From November through December 2022, Mr. Bickford's family and friends observed a significant shift in Mr. Bickford's demeanor. Mr. Bickford's friend, Michael, recalled that he "completely changed during a very short period," as his "demeanor and actions were completely unlike anything [he] had seen from him. He wasn't the Trevor from before and seemingly switched to a different person." Ex. E at 20-21 (Michael Ducharme's letter). Similarly, his friend, Daniel, recalled that in just "a few months before" Mr. Bickford's "behavior was completely off and something seemed wrong with him in his mannerisms and the way he talked." Ex. E at 19 (Daniel Marquis' letter).

### **Mr. Bickford's Family Tried and Failed to get Mental Health Treatment and Help from Local and Federal Law Enforcement in the Days Preceding the Attack.**

When Mr. Bickford revealed to his mother that he believed he was a prophet and felt compelled to travel to the Middle East, she realized the progression of Mr. Bickford's illness and sought help. In December 2022, Ms. Simpson reached out to the local Wells police in the hopes that they would "help [] blue paper him" to identify him as a person with mental illness that places himself and others at risk and requires evaluation and hospitalization. Ex. E at 3 (Audra Simpson's letter); *see also* 34-B Maine Rev. Stat. § 3863. However, since Mr. Bickford "wasn't talking about harming himself," the officers would not issue it. Ex. E at 3 (Audra Simpson's letter).

Desperate for help in any form, on December 10, 2022, Ms. Simpson escorted Mr. Bickford, who was still in the throes of psychosis, to Spring Harbor Hospital in Maine and expressed that she had "concerns about [his] psychotic behavior" in the hopes of having him hospitalized. Maine Medical Center Records, attached as Exhibit H, at 2. Ms. Simpson informed the staff that she was "very concerned about his religiosity" and "his behaviors" as he had been "isolating himself," "crying throughout the day," and refusing to go home. *Id.* at 3. Upon meeting with staff, Mr. Bickford shared as much and spoke of his plans "to travel to Afghanistan and/or China to fight a Jihad and against the genocide of others" without "insight into the potential dangerousness of his plan." *Id.* at 3. Given their observations, the Spring Harbor staff referred Mr. Bickford to Maine Medical Center ("MMC") and transferred him via ambulance to the emergency room for "evaluation and crisis assessment." *Id.*

At MMC, Mr. Bickford explained to the doctors that he "want[ed] to go to China and Burma to fight against genocide." Ex. H at 6. He further detailed that "[h]e may try to find the Taliban to give them his [own] teachings." *Id.* at 17. Ms. Simpson informed the doctors that Mr. Bickford's "religion" was nonsensical as his "religious ideals change daily" and that it even led him to live "in the woods in a tent" until the Maine winter weather forced him to come home. *Id.* She further noted that Mr. Bickford "believes his religion chose him and [that] he now has a special power with the religion." *Id.* at 18. In his MMC records, the medical staff noted that Mr. Bickford

had "thoughts of harming others," had a "expresse[d] intent for harming others," and presented a "risk of elopement." *Id.* at 9, 18.



*Id.* at 9. Given the obvious risk Mr. Bickford presented to himself and others and his lack of clear thinking, Ms. Simpson hoped that the doctor "would hold him for observation" at the very least. Ex. E at 3 (Audra Simpson's letter). Instead, however, the hospital immediately discharged Mr. Bickford, provided the family with information for a local "teen shelter," and referred him to outpatient treatment. Ex. H at 22.

As described in her letter to the Court, Ms. Simpson was devasted:

> I was baffled and I was exhausted, it was now 3am and all I wanted to do was to go to bed. I felt defeated. He was so obviously out of his mind and they wouldn't even keep him for observation. . . . You have no idea how angry I am with Maine Medical Center in Portland, if they just listened to me, if they just helped him and got him on the medication he needed then he wouldn't be where he is today. . . . [H]e could have gone to a hospital where he could [have] received the help he needed and gotten on the meds necessary to help the psychotic break he was experiencing.

Ex. E at 3 (Audra Simpson's letter).

After Ms. Simpson's second failed attempt to obtain help for Mr. Bickford, his family contacted the FBI for their assistance. On December 13, 2022, Mr. Bickford met with FBI agents in Maine and again shared his introduction into Islam, describing a "surge of intense pain, followed by a state of bliss" – "a sign that Islam was for him." *See* FBI 302 for Trevor Bickford, attached as Exhibit I. He discussed how he attended a mosque in New Hampshire, but then stopped attending and had no imam that he followed and did not want "to 'put a label on himself.'" *Id.* at 2. Mr. Bickford then discussed the various international flights he had purchased and subsequently canceled: "He was set to fly to New Delhi, India and then was going to travel to Afghanistan via Kabul Airways flight from there" with the goal of "convinc[ing] [the Taliban] to help stop the genocide in Burma." *Id.* He also discussed how he planned to visit Saudi Arabia as he wanted to

make the "pilgrimage to Mecca," without realizing that he needed permission to visit Mecca from the Saudi government.  *Id.* at 4.  During the same conversation, Mr. Bickford changed his mind about traveling to Afghanistan as it was "too dangerous" and stated that he planned to travel to Jordan instead to visit the Al Aqsa Mosque, which the agent noted in his report was actually "not located in Jordan, but in Israel."  *Id.* at 3.  Mr. Bickford explained to the officers that he had purchased a plane ticket for the next day to Jordan, but had decided to "cancel[] the trip in order to see his [older] brother the following weekend" when he was in town from his army base in Louisiana.  *Id.*  Although Mr. Bickford had purchased plane tickets to Jordan, he admittedly had no "hotel booked and d[id] not know where he [wa]s going to stay," but planned to bring his "tent and some camping gear" along with his "military bag that he used when he was a Civil Air Patrol cadet."  *Id.* at 4.  Given Mr. Bickford's obvious delusions, the FBI placed him on a "no fly list" and enlisted Ms. Simpson to assist them with "keep[ing] an[] eye on him."  Ex. E at 3 (Audra Simpson's letter).

In her letter to the Court, Mr. Bickford's Aunt Jen reflects on the challenges the family had in obtaining help for Mr. Bickford, who the whole family helplessly saw decompensating before their own eyes:

> Given that the adults in Trevor's life were candidly sharing with the police, the FBI, and doctors that this was a dramatic shift from the person he had always been, shows the breakdown in the healthcare and law enforcement agencies in responding to "see something, say something."  Trevor was a broken teen, only months into adulthood, grieving and suffering from unimaginable loss and guilt.  He had snapped, and no one with the power to help him would help him.

Ex. E at 10 (Jennifer MacNeil's letter).

## Offense Conduct

On December 27, 2022, Mr. Bickford decided to plan a trip from Wells, Maine and travel down the east coast of the United States.  That day, he purchased an Amtrak train ticket from Boston to New York City to depart on December 29, 2022 where he planned to remain into the new year.  As confirmed through Amtrak records, that same day, he also purchased a train ticket from New York City to Miami, Florida to depart on January 3, 2023.  Ex. A at 9.

On December 29, 2022, Mr. Bickford traveled to New York City and, wandered New York City for hours with the three bags he brought on his journey.  Ex. A at 9.  Without a plan of where to stay, he eventually stumbled upon the Bowery Hotel using money he had made from selling his car in Maine.  *Id.*  While in New York City, much of Mr. Bickford's time was spent in his room, watching YouTube videos and eating food he had brought with him from home, as he was afraid of spending the little money he had.  *Id.*  Having recently developed a paranoia, Mr. Bickford would go on a dark web phone app, which he had only downloaded earlier that week, and used

public search engines to research his random intrusive thoughts – no matter how odd or nonsensical. When he was not in his room, Mr. Bickford wandered New York City looking for places to sleep as he anticipated he would soon be unable to afford his hotel room before his train departed to Florida. As documented in a detective's complaint report, on December 30, 2022, while in his hotel room and watching YouTube videos, Mr. Bickford believed he received a message from God to attack officers in Times Square using the kukri knife he brought with him from Maine for protection. *Id.*

The next day, with "no real plan" but "trusting that he 'would be guided to the right path,'" Mr. Bickford left his hotel and sat in a park in Chinatown. Ex. A at 9. He then donated $2,000 to the Bowery Street Charity and rode the J train deep into Queens where he left his sleeping bag and food. *Id.* at 10. Later that evening, he arrived in Times Square and, after eating and praying near a food cart, attacked three officers who were patrolling Times Square with his kukri knife while shouting "Allahu Akbar." In response, one of the officers pushed Mr. Bickford away and discharged his weapon, hitting Mr. Bickford in the shoulder. In later interviews, Mr. Bickford expressed that he believed the outcome of his actions would have either resulted in his death or "that he would be captured and would be exchanged for Americans being held by the Taliban" even though he admittedly did not know if the Taliban was holding any American prisoners or that the Taliban would even want him. *Id.* After the incident, Mr. Bickford was taken to Bellevue Hospital where he remained until he was transferred into federal custody.

Since the incident, Mr. Bickford has expressed deep remorse and regret for his conduct that night:

> I owe an apology to so many: to the officers I harmed, their families, the witnesses to my crime, to my family, to my community, and lastly to the United States of America. I understand that I have left scars, both physical and mental, on so many people. I wish that I could take back my actions. I'm grateful for the officers' quick thinking and actions to make sure I didn't hurt anyone else that night. Growing up I always wanted to be in law enforcement or go to the military. It really pains me that I hurt the same law enforcement community that I wanted to be a part of and that my family is and has been a part of. I don't know if I can ever show you how sorry I am and how I wish every day that I could go back in time and change what happened.

Trevor Bickford's Letter to the Court, attached as Exhibit D at 1.

### Mr. Bickford's Mental Health Treatment and Behavior While in Custody



Ex. A at 14.  Once he was medically cleared, on January 9, 2023, Mr. Bickford was transferred to the care of Dr. Raina Aggarwal, M.D. in Bellevue Hospital's Inpatient Forensic Unit. According to Bellevue medical records, Mr. Bickford reported that his ear popping influenced his decision making and that he felt as though there was a "leech" sucking on his face that would cause the popping sensation.[3]

After beginning his course of antipsychotic medications, the popping noises Mr. Bickford experienced decreased, he no longer had violent ideation towards the police, and expressed "extreme guilt and regret" for his actions.  *Id.*

Eventually, on February 6, 2023, over Dr. Aggarwal's objections, Mr. Bickford was discharged from Bellevue Hospital into federal custody.

Upon transfer to the MDC, Mr. Bickford's medication regimen abruptly ended, which led to the recurrence of suicidal ideation and hallucinations.

While in custody Mr. Bickford has remained compliant with his treatment regimens and no longer gives any meaning to his ear popping sensations.  *Id.*

Mr. Bickford's family has noticed a significant change in Mr. Bickford since he began his treatment.  He is no longer a practicing Muslim and has converted to Christianity.  Ex. C at 11.  As his brother, Devin, describes in his letter, Mr. Bickford has made significant progress while in custody:

---

[3] Given the length of the medical records from Bellevue Hospital, the defense did not attach them to the sentencing submission.  However, should the Court wish to review them, the defense is happy to provide them upon request.

> Since Trevor's arrest and introduction to medication, I have noticed
> a significant change in his attitude and behavior. He usually calls me
> a couple of times a month just to see how I'm doing. He's talkative
> and curious, he isn't withdrawn like he used to be. When we were
> face to face talking and laughing together, I realized that Trevor is
> his old self again.

Ex. E at 7 (Devin Bickford's letter).

His Aunt Jen similarly noted that she "heard a change in the tone and cadence of his voice" and that he "now sounds more like the 'old' Trevor - the Trevor who acted with kindness, compassion, and honesty." Ex. E at 11 (Jennifer MacNeil's letter). Ms. Simpson sees how Mr. Bickford is "doing so much better now he's back to his old self again. He has been great with his meds knowing that he needs to take them and advocating for himself when needed." Ex. E at 4 (Audra Simpson's letter). Indeed, all of the people who initially noticed the changes in Trevor for the worse and tried to seek help have now also seen his progress for the better since he began medication.

### Mr. Bickford's Mental Health Evaluations

The defense retained three different experts to evaluate Mr. Bickford in connection with this case. *See* Report of Dr. Ronald Schouten, M.D., J.D., attached as Exhibit A; Report of Dr. Elise Caccappolo, PhD, ABPP-CN, attached as Exhibit B; and Report of Erik Mercer, L.C.S.W., attached as Exhibit C.

**I.     Dr. Ronald Schouten, M.D. Concludes that Mr. Bickford's Offense was the Product of his Serious Mental Illness.**

Dr. Ronald Schouten, M.D., J.D. currently works, *inter alia*, as the Director of Forensic Psychiatry Fellowship at St. Elizabeth's Hospital. Ex. A at 2. His background also includes working as a consultant to the FBI's National Center for the Analysis of Violent Crime. *Id.* at 3.

Dr. Schouten's comprehensive evaluation focused on Mr. Bickford's psychiatric history and condition, his course of treatment, the current offense, the role Mr. Bickford's mental illness, if any, played in the instant matter, and whether he presents an ongoing risk of serious harm to others. Ex. A at 2. In addition to reviewing medical, school, and case-related records in this case, Dr. Schouten also met with Mr. Bickford, spoke with family and friends, and consulted with Dr. Aggarwal – Mr. Bickford's psychiatrist at Bellevue Hospital. *Id.*



## II. Dr. Elise Caccappolo, PhD Agrees with Dr. Schouten's Findings in All Respects and Concludes that with Continued Monitoring and Treatment, Mr. Bickford Does Not Pose a Serious Risk of Harm to Others.

Given Dr. Schouten's recommendations for a neuropsychological evaluation in this case, the defense retained Dr. Elise Caccappolo, PhD.  Ex. B at 1.  Dr. Caccappolo also reviewed numerous records, interviewed Mr. Bickford, spoke with collateral contacts, and conducted several psychological tests.  Ex. B at 1, 6.



### III.    Erik Mercer, L.C.S.W. Concurs with Dr. Schouten and Dr. Caccappollo that Mr. Bickford's Offense Conduct Arose out of his Untreated Mental Illness.

In addition to the two experts discussed above, the defense also retained mitigation specialist Erik Mercer, L.C.S.W., who has had extensive experience conducting mitigation investigations, including an appointment from the United States Military Commission to work at Guantanamo Bay. Ex. C at 1. Mr. Mercer, who was retained early on in this case, reviewed numerous records and conducted eight interviews with Mr. Bickford at the MDC Brooklyn, as well as interviews in Maine and New Hampshire with eleven members of Mr. Bickford's family and community. *Id.*

During the course of Mr. Mercer's interviews with family, it was made clear that despite Mr. Bickford's belief that his father's death was the result of suicide, this was not the case. Ex. C at 10. Rather, his cause of death – as confirmed through his death certificate – was an accidental overdose. *Id.* On May 17, 2023, during a meeting with Mr. Bickford, Mr. Mercer revealed to Mr. Bickford that his father had not committed suicide as he had believed for all these years. *Id.* Mr. Bickford was "overwhelmed with emotion" at the news and regretted not receiving this information earlier, as "it would have spared [him] so much pain." *Id.*

15



### Guidelines Analysis

## I. The Correctly Calculated Guidelines Should Not Include the Terrorism Enhancement

The defense agrees with Probation that Counts Two through Seven group together and have a base offense level of 33. For the reasons stated below, the defense objects to the application of the "terrorism enhancement," pursuant to U.S.S.G. § 3A1.4(a), to enhance both the offense level and criminal history category. The application of this enhancement is disproportionate and greater than necessary to achieve the statutory goals of sentencing under 18 U.S.C. § 3553(a). As such, the Court should not apply the terrorism enhancement and reject Probation's guidelines calculation.[4]

### a. The Terrorism Enhancement Does Not Apply Where Mr. Bickford's Actions were Motivated by Mental Illness – Not Terrorism or Radicalization.

Section 3A1.4 provides that a defendant's offense level should be increased by 12 levels if the felony "involved, or was intended to promote, a federal crime of terrorism." The automatic 12-level increase is harsh in terrorism cases as "[t]errorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the

---

[4] Without this enhancement, the correct offense level is 41, pursuant to U.S.S.G. §§ 2A2.1(a)(1), (b)(1)(B), and 3A1.2(a)(1). In criminal history category I, his corresponding guidelines range would be 324-405 months' imprisonment.

criminal." *United States v. Mumuni*, 946 F.3d 97, 112-13 (2d Cir. 2019) (internal quotations omitted); *see also United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) ("Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat ..., and thus that terrorists and their supporters should be incapacitated for a longer period of time.").

A crime of terrorism is defined as an offense that "is *calculated* to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A) (emphasis added). The Second Circuit has held that "'[c]alculation' is concerned with the object that the actor seeks to achieve through planning or contrivance." *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010). As such, section 2332b(g)(5) is "better understood as imposing a requirement 'that the *underlying felony* [be] calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.'" *Id.* (quoting *United States v. Stewart*, 590 F.3d 93, 138 (2d Cir. 2009)) (emphasis in original)

For the terrorism enhancement to apply, the government bears the burden of establishing that a defendant possessed the "specific intent" to commit an act of terrorism. *Stewart*, 590 F.3d at 138 ("[C]ommission of a federal crime of terrorism . . . incorporates a specific intent requirement."). Here, however, the government cannot meet its burden of establishing that Mr. Bickford possessed the requisite specific intent where his words and actions arose out of his mental illness.

As three independent experts concluded – two of whom have extensive backgrounds in terrorism-related cases – Mr. Bickford's "actions on and around December 31, 2022 were the product of his evolving serious mental illness" as they were "shaped by his emerging psychotic symptoms, which included hallucinatory experiences that directed him as to the correctness of his decisions and thoughts." Ex. A at 18; *see also* Ex. B at 9; Ex. C at 11. As such, the government must cite to Mr. Bickford's words and conduct *beyond* the times when he was in the throes of psychosis to meet its burden of establishing the requisite specific intent or "calculation" for the terrorism enhancement as it is otherwise only evidence of mental illness and nothing more.

This is supported when considering the underlying rationale behind the terrorism enhancement and the cases in which it has historically been applied – i.e. cases involving actual terrorists, rather than teenagers experiencing their first psychotic breaks. *See, e.g.*, *United States v. Rahimi*, 16 Cr. 760 (RMB) (S.D.N.Y. 2018) (applying the terrorism enhancement where the defendant – an Islamic extremist – set off two bombs in New York and New Jersey injuring more than 30 people, opened fire on arresting officers, remained unrepentant about his conduct, and attempted to radicalize fellow inmates while in pretrial detention); *Mumuni*, 946 F.3d at 103-06 (applying the terrorism enhancement in case where the defendant, who had no mental health issues, was an ISIS member who actively worked with others to fly them internationally to join ISIS and to bomb police cars in the United States. At the time of his arrest in his home, the defendant, while concealing a knife behind his back, charged towards the arresting agent attempting to stab him

repeatedly at his chest); *United States v. Banol-Ramos*, 516 F. App'x 43 (2d Cir. 2013) (sentencing defendant to fifteen years and applying the terrorism enhancement to a member of the FARC who initiated a shootout with her comrades against the Panamanian police).   For example, in *United States v. Ceasar*, 10 F. 4th 66 (2d Cir. 2021), the defendant pleaded guilty to materially supporting a foreign terrorist organization by "intentionally and knowingly connect[ing] individuals in the United States with those abroad who would do the United States harm." *Id.* at 83.   While on pretrial release awaiting sentencing, the defendant was still engaging in recidivist behavior by "recreating pseudonymous social media accounts to reconnect with ISIS supporters; deleting incriminating communications to evade punishment and encouraging others to do the same; and then making false and misleading statements to law enforcement when questioned about this conduct." *Id.*  Accordingly, in that case, the terrorism enhancement was applicable and, given the defendant's terroristic and recidivist acts while on bail, warranted a sentence above 48 months.

Unlike *Ceasar* and the other cases referenced above, Mr. Bickford immediately renounced his acts and expressed remorse when he started his medication regimen.   It was not because someone had convinced Mr. Bickford that his ideologies were wrong or that someone was able to reason with him; rather, it was medication and mental health treatment, demonstrating that neither extremism nor radicalization governed Mr. Bickford's actions that day, but psychosis.   Nor can it be said that Mr. Bickford was "calculated" in his attack of the officers where he had only gotten the idea the night before when his right ear popped loudly; his Amtrak train ticket purchase to Miami with plans to leave on January 3 confirmed as much.   Moreover, the randomness of his internet searches similarly support that Mr. Bickford was not calculating, but rather, immersed in his psychosis and investigating any random thought that entered his head.   Indeed, the lack of calculation and erratic conduct is consistent with Mr. Bickford's everchanging plans and behaviors preceding the incident, such as spending time and money moving to Seattle for a diving program he was committed to yet returning after only a week or purchasing a one-way plane ticket to Jordan without any plans and then canceling because he heard his brother was in town.   Mr. Bickford's thoughts and actions were governed by his auditory, tactile, and visual hallucinations, not because of radicalization or extremism.

As a result, this is not a case where Mr. Bickford's "specific intent is relatively easy to identify, either from the statements or admissions of the defendant or the nature of the offense" as Mr. Bickford was experiencing delusions and hallucinations when he committed the offense and when he spoke to the officers thereafter.  *United States v. Alhaggagi*, 978 F.3d 693, 701 (9th Cir. 2020).  Where the words and acts used to justify the terrorism enhancement were the product of schizophrenic delusions and not calculation, they deserve minimal consideration.  Indeed, even the government in *United States v. Redzepagic*, acknowledged that evidence that a person "who was driven by some sort of mental disease or defect to go and try to join a terrorist organization" would be a "mitigating factor to his conduct."  *United States v. Redzepagic*, No. 21-2993, 2023 WL 129886 *16 (2d Cir. Jan. 3, 2023) (Government-Appellee brief); *see also United States v. Chatman,* 986 F.2d 1446, 1452 (D.C. Cir. 1993) ("two of the primary rationales for punishing an individual by incarceration – desert and deterrence – lose some of their relevance when applied to those with reduced mental capacity."); *United States v. Williams*, 21 Cr. 99 (JCC), ECF. No. 43 (W.D.W.A.

18

Nov. 29, 2022) (rejecting the government's request for a 15-year sentence and sentencing defendant to 48 months' imprisonment to be followed by 15 years' supervised released due to the defendant's "history of mental-health problems" which led him to join ISIS at 20 years old).  This should also hold true when evaluating whether a person's mental health affected their ability to formulate the requisite specific intent for the terrorism enhancement.

Given the clear evidence and resounding expert agreement that "Mr. Bickford's actions on December 31, 2022 were due to his psychosis," and not radicalization or extremism, this is not the case that Congress and the Sentencing Commission had in mind when fashioning the terrorism enhancement.  Under the unique circumstances of this case, the enhancement should not be applied.

**b.  The Defense Objects to Criminal History Category VI Where Mr. Bickford is a Zero-Point Offender and Has Never Had Prior Contacts With the Criminal Legal System.**

The Court should not apply the terrorism enhancement to increase Mr. Bickford's Criminal History category from I to VI.  Courts have expressed concern about the automatic increase to a category VI for all defendants, regardless of their prior criminal histories, as the terrorism enhancement "is not backed by any empirical evidence" and treats all defendants as though they are career criminals. *United States v. Jumaev*, 2018 WL 3490886 at \*9-10 (D. Colo. 2018).  Indeed, the enhancement to a category VI "import[s] a fiction into the calculus" of determining a person's criminal history category as "[i]t would impute to a defendant who has no criminal history a fictional history of the highest level of seriousness." *Id.* at \*9-10 (internal quotations omitted); *see also United States v. Alhaggagi*, 2019 WL 1102991, \*5-7 (N.D. Cal. 2019) (finding the terrorism enhancement applied but departing to the defendant's true criminal history category of I because "automatically assigning to all terrorism defendants a criminal history category of VI – is inappropriate based on the seriousness of the crime, inappropriate based on assumptions about recidivism, and inappropriate as to this Defendant.").

> [T]he automatic assignment of a defendant to a Criminal History Category VI is not only too blunt an instrument to have genuine analytical value, it is fundamentally at odds with the design of the Guidelines. It can, as it does in this case, import a fiction into the calculus. It would impute to a defendant who has had no criminal history a fictional history of the highest level of seriousness. It's one thing to adjust the offense level upward to signify the seriousness of the offense. It is entirely another to say that a defendant has a history of criminal activity that he does not, in fact, have.

*United States v. Mehanna*, 09 Cr. 10017 (GAO), ECF Dkt. No. 439, at 69 (D. Mass. 2012).

Even in cases where courts have upheld the increase in both offense level and criminal history category, courts have acknowledged that the criminal history category increase can be over-representative of a person's criminal history and their risk of recidivism. *See, e.g.*, *United States v. Meskini*, 319 F.3d 88 (2d Cir. 2003). In *Meskini*, the Second Circuit, even while opining that terrorists are "unique among criminals," also made sure to note that "[a] judge determining that § 3A1.4(b) over-represents 'the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes' always has the discretion under § 4A1.3 to depart downward in sentencing." *Id.* at 92 (quoting U.S.S.G. § 4A1.3). While the *Meskini* Court found its particular defendant's "complaint that § 3A1.4(b) is unfair to defendants without a criminal history r[a]ng[] particularly hollow" given his "extensive history of crime," the same cannot be said for Mr. Bickford. *Id.*

Here, Mr. Bickford has no criminal history; thus, increasing his category history level to VI is inappropriate as it does not in any way reflect the seriousness of Mr. Bickford's criminal history. Nor is the goal of incremental deterrence for a person with a pattern of criminal conduct achieved here given Mr. Bickford's lack of criminal history. As such, the terrorism enhancement should not apply to Mr. Bickford's criminal history category. However, even if the Court applies the enhancement, it should downwardly depart given Mr. Bickford's actual criminal history, the remaining 3553(a) factors discussed in more detail below, and Mr. Bickford's low risk of recidivism.

## A Sentence of 120 Months' Imprisonment is Sufficient But Not Greater Than Necessary to Achieve the Goals of Sentencing

The Second Circuit has explained that, "[i]n deciding what sentence will be 'sufficient, but not greater than necessary' to further the goals of punishment . . . a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) (second internal quotation marks omitted). In *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006), the Second Circuit explained that if the Court believes a lower sentence will be as effective as a higher sentence in serving the purposes of sentencing, it must choose the lower sentence. *Id.* at 142 (observing that where a guidelines sentence is "in equipoise with [a] below-the-range sentence," the parsimony clause requires imposition of the lower sentence).

The defense and Probation agree that a downward variance is appropriate in this case. However, Probation's suggested downward variance of fifty years is effectively a life sentence. A sentence of ten years followed by a fifteen-year term of supervised release is sufficiently harsh and appropriate.

20

I.     **A 10-Year Sentence will Sufficiently Punish and Rehabilitate Mr. Bickford, Who Has Already Renounced His Actions and Is Fully Engaged in Treatment for his Mental Illness**

There is no doubt that Mr. Bickford needs to be punished for this offense.  He has accepted responsibility and deeply regrets the physical, psychological, and emotional pain he has caused the officers and those who witnessed his attack.

After reading the victim impact statements in the draft PSR, defense counsel reached out via email dated March 6, 2024 to the Government to offer the victims the opportunity to participate in a supervised meeting with Mr. Bickford, facilitated by a professional who specializes in restorative justice practices. PSR at ¶ 39-42.  Research has shown that "restorative justice practices [including facilitated direct meetings between victims and offenders] have a positive psychological impact on victims, who are frequently forgotten in conventional justice, and that some of these impacts persist over time." Nascimento et al., *The Psychological Impact of Restorative Justice Practices on Victims of Crimes – a Systemic Review*, 24(3) Trauma, Violence, & Abuse (2023).[5]

Recognizing the connection between his actions and his mental illness, Mr. Bickford has purposefully engaged in the treatment process and has worked hard to understand the symptoms of his conditions.  This greater understanding has allowed him to self-monitor and engage the appropriate resources when necessary.  Ex. B at 10; Ex. A at 18; MDC Records, attached as Exhibit F, at 36.  Given his continued successful participation in psychiatric treatment, Mr. Bickford presents a "very low risk" to the community.  Ex. B at 10; Ex. A at 18.

Mental health professionals at the MDC have recognized and praised Mr. Bickford's efforts.  *See* Ex. F.  The records indicate that Mr. Bickford is "forthcoming throughout" his sessions with his treatment providers "and continues to evidence a willingness to inform []his clinician of things in his life that he is having emotional reactions to/needs to process." Ex. F at 31. The records indicate that at times, Mr. Bickford "request[s] services" when he needs additional support, demonstrating his "motivation to make positive changes," which "can help him in the future." *Id.* at 38.  Mr. Bickford's MDC records similarly confirm that Mr. Bickford, who still at times experiences an ear popping auditory hallucination, has learned to identify it as such and not draw

---

[5] Although uncommon in this district, such practices have been used, with positive effects, in other districts. For example, in the Eastern District of Virginia, in a case involving the kidnapping and videotaped beheading of journalist James Foley, a term of the defendant's plea agreement required him to agree to "supervised direct meetings with all victim family members and released hostages, if those victims request any such meetings." *See United States v. Alexanda Amon Kotey*, 20 Cr. 239 (TSE), ECF No. 89 at 8.  In a recently published book, James Foley's mother described the relief she felt at the end of meeting with the defendant, who had pleaded guilty to "Hostage Taking Resulting in the Death of James Wright Foley." *See Kotey*, ECF No. 89 at 1.  "It was the Holy Spirit that was present for those awkward hours of conversation, she was sure of it. The tears had been a gift. She had been released. She was quite sure Jim had been sitting alongside her. . . It was time to heal." *See* Colum McCann with Diane Foley, *American Mother* 42 (2024).

meaning from the ear popping as he had previously: "[h]e shared he used to believe his ears popping was a sign for him to make a decision (i.e., one ear for one choice, the other for another), but he does not believe this anymore.  His ability to recognize and challenge this maladaptive belief was praised by this clinician." *Id.* at 36.

Mr. Bickford's rehabilitation efforts, however, extend beyond treatment compliance. Mr. Bickford provided life-saving care to another inmate. On that date, he encountered another inmate on his unit with self-inflicted wounds. Ex. F at 40.  Mr. Bickford immediately applied pressure to the area, requested assistance from other inmates to notify BOP personnel, and awaited medical staff while keeping the inmate stable. *Id.*; Ex. C at 12.  The inmate survived his injuries. The event triggered Mr. Bickford, who was reminded of his father's death and his friend's suicide. He "experience[ed] trauma-related symptoms," "including flashback and feeling stressed when he walks past the cell, nightmares, and intrusive memories" as well as physical responses, including "tightness in his chest and shortness of breath." Ex. F at 39.  Significantly, Mr. Bickford proactively sought treatment from the MDC providers when he was having a challenging time processing the scary event. *Id.*

In determining appropriate sentences, courts have considered "acts of heroism," in assessing a person's rehabilitation while in custody. *See, e.g.*, *United States v. Ramos*, 2023 WL 1766279 (E.D.N.Y. 2023) (finding that the defendant's application of a life-saving tourniquet to a correction officer that suffered a serious arterial injury, *inter alia*, justified a modification of his sentence); *United States v. Meeks*, 2021 WL 9928774 (N.D. Ill. 2021) (modifying a defendant's sentence to time served where the defendant provided life-saving treatment to an inmate during an attempted suicide).  Indeed, performing life-saving treatment to an inmate "would be notable even outside the federal prison system" and even "exceeds the bounds of what [courts] consider 'rehabilitation.'"  *United States v. Torres*, 464 F. Supp. 3d 651, 663 (S.D.N.Y. 2020).  This Court should similarly consider Mr. Bickford's life-saving actions, for which he received a MDC Certificate of Appreciation for Exemplary Pro-Social Behavior, as a demonstration of his "reformed personal disposition," and also because "another man's life now continues on account of it." *Meeks*, 2021 WL 9928774 at *3; *see* Certificates and Transcript, attached as Exhibit G.

## II.     Mr. Bickford – a First-Time Offender – is Wholly Deterred From Committing Any Future Criminal Conduct and Presents a Low Risk of Recidivism

Mr. Bickford's lack of any prior criminal conduct, his immediate engagement with treatment after the incident and his continued compliance with treatment, render him a low risk of reoffending.  Promisingly, "the sooner the treatment begins, the better the outcome will be." [6] Research shows "increased early contact with mental health services may reduce the risk of

---

[6] Understanding A First Episode of Psychosis Young Adult: Get the Facts. 12 Dec 2023. Substance Abuse and Mental Health Services Administration (SAMHSA). Available at https://www.samhsa.gov/ resource/ebp/understanding-first-episode-psychosis-young-adult-get-facts

recidivism for men with severe mental illness."[7]  Unlike some people with psychosis, who do not believe they are unwell, Mr. Bickford has accepted his condition. He understands he will likely need to take medication to manage his symptoms for the rest of his life.

Courts have recognized that *any* prison sentence for persons without criminal histories, like Mr. Bickford, will have greater significance and deterrent effect than for those with criminal histories, who may require longer sentences to have greater deterrent effect. *See, e.g.*, *United States v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001). Further, evidence-based studies strongly support the conclusion that it is the certainty of being prosecuted rather than the severity of punishment that deters crime. *See* Five Things About Deterrence, Nat'l Inst. Of Just., (June 2, 2016), available at https://nij.ojp.gov/library/ publications/five-things-about-deterrence. The fact that Mr. Bickford was prosecuted, jailed, and punished with a decade of imprisonment will provide sufficient general deterrence; a lengthy additional term of incarceration is greater than necessary.

### III.   Mr. Bickford's Young Age at the Time of the Offense Warrants a Downward Departure or Variance

Mr. Bickford's young age at the time of the offense is an important mitigating factor in this case as "youth matters in sentencing." *Jones v. Mississippi*, 593 U.S. 98 (2021). First, young people are less culpable because their judgment and impulse control are not as developed as an older person, and second, young people have a far greater capacity for change. *See Graham v. Florida*, 560 U.S. 48, 68, 74 (2010) (explaining that youth have "lessened culpability" and greater "capacity to change.").

The Supreme Court has time and again recognized "the mitigating qualities of youth" to be considered at sentencing. *Miller v. Alabama*, 567 U.S. 460, 476 (2012) (holding that mandatory life without parole for juvenile offenders was unconstitutional in all cases) (internal quotation marks omitted); *see also Gall v. United States*, 552 U.S. 38, 58 (2007); ("[I]t was not unreasonable for the District Judge to view [21-year-old] Gall's immaturity at the time of the offense as a mitigating factor, and his later behavior as a sign that he had matured and would not engage in such impetuous and ill-considered conduct in the future."); *Johnson v. Texas*, 509 U.S. 350, 367 (1993) (finding, in the case of a 19-year-old convicted of murder, that "[t]here is no dispute that a defendant's youth is a relevant mitigating circumstance."). Similarly, the Second Circuit has held that youth is such a significant factor that remand for resentencing is warranted if there is inadequate consideration of a defendant's youth when fashioning a sentence. *See United States v. Delgado*, 971 F.3d 144, 159 (2d Cir. 2020). "'[Y]outh is more than a chronological fact.' It is a time of immaturity, irresponsibility, 'impetuousness[,] and recklessness.' It is a moment and 'condition of life when a person may be most susceptible to influence and to psychological

---

[7] Adily, A., Albalawi, O., Kariminia, A., Wand, H., Chowdhury, N. Z., Allnutt, S., ... & Butler, T. (2020). Association between early contact with mental health services after an offense and reoffending in individuals diagnosed with psychosis. *JAMA psychiatry*, *77*(11), 1137-1146.

damage.' And its 'signature qualities' are all 'transient.'" *Miller*, 567 U.S. at 476 (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982) and *Johnson*, 509 U.S. at 368). The Supreme Court noted that these conclusions rest "not only on common sense—on what 'any parent knows'—but on science and social science as well." *Id.* at 471.

In 2014, the National Institute of Justice ("NIJ") – the research, development and evaluation agency of the U.S. Department of Justice – conducted research on juvenile and young adult offenders and concluded that "young adult offenders ages 18–24 are more similar to juveniles with respect to their offending, maturation and life circumstances." *See* NIJ, From Juvenile Delinquency to Young Adult Offending (2014).[8]  Recommendations included the establishment of "special courts for young offenders ages 18–24" and an "'immaturity discount' for young offenders that would involve a decrease in the severity of penalties, taking into account a young person's lower maturity and culpability." *Id.*

Just this month, the Sentencing Commission voted to promulgate an amendment to the Guidelines relating to youthful offenders.  *See* U.S. Sent'g Comm'n, Amendments to the Sentencing Guidelines, April 17, 2024, *Youthful Individuals* at 1.[9]  According to the Commission, "[r]esearch has shown that brain development continues until the mid-20s on average, potentially contributing to impulsive actions and reward-seeking behavior." *Id.* (internal citations omitted). As such, the Commission's proposed amendment include a change to section 5H1.1 to include language that specifically calls for courts to consider a downward departure "due to the defendant's youthfulness at the time of the offense or prior offenses." *Id.* at 2.  The reason for the amendment is explained as follows:

> Certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation.

*Id.* at 2.

The onset of psychosis is also common in late teens, early twenties for males, often resulting from a combination of psychiatric and medical disorders, substance use, trauma, genetics,

---

[8] Available at https://nij.ojp.gov/topics/articles/juvenile-delinquency-young-adult-offending.

[9] Available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202404_prelim-rf.pdf.

and environment.[10]  The abuse and dysfunction in Mr. Bickford's household, his father's death, Mr. Bickford's subsequent substance use all contributed to the onset of his psychiatric symptoms as "[s]tudies have found that children with histories of chronic trauma are almost three times as likely to experience psychosis in adulthood." Ex. C at 9; *see also* Ex. A at 17-18; Ex. B at 9-10.

Mr. Bickford's loved ones identified changes in behavior, confused thinking, and delusions he was experiencing in 2022 and tried to connect him to services as best they could. Unfortunately, he was not admitted to emergency services in Maine in December 2022, just days before this offense, nor was he "blue paper[ed]" by local law enforcement or the FBI. Tragically, it was only until this arrest that he was afforded the necessary care to manage his psychiatric symptoms.

Mr. Bickford has already demonstrated his "capacity to change" – a quality that Supreme Court has recognized to be especially true for youths.  While in custody, Mr. Bickford has had no disciplinary infractions.  Additionally, Mr. Bickford, channeling his love of school and academia, has served as a GED tutor for other inmates as he maintains an "overall desire to continue helping others." Ex. F at 41.  Mr. Bickford's "goal- and future-oriented" nature demonstrate his inherent "capacity for change" that he continues to demonstrate even under the challenging conditions at MDC.  *Id.*

Indeed, this Court has previously considered these same qualities of a youthful defendant to justify a reduction of sentence, even in an attempted murder case where the defendant – a drug dealer and gang member – shot an innocent bystander.  *See United States v. Brito*, 16 cv. 7618 (PKC), ECF. No. 35 at 9 (S.D.N.Y. Apr. 12, 2024) (reducing the defendant's sentence after making the necessary "assessment of the special social, psychological, and biological factors attributable to youth.").  In *Brito*, this Court, citing *Miller* and *Delgado*, found that "extraordinary and compelling reasons" existed to support a reduction of sentence where the defendant was "17 years and eleven months at the time of the shooting," had a "horrific upbringing," possessed a "low I.Q. of 74," and had a "mental illness" of bipolar disorder.  *Id.* at 10-11.  Mr. Bickford was just 18 months older than the *Brito* defendant at the time of the offense and, with his significant underlying mental illness caused, in part, by his traumatic upbringing, warrants this same consideration.

Because punishment and retribution relate to an offender's blameworthiness, the case for harsh punishment is not as strong with a young person as with an older adult. *See Montgomery v. Louisiana*, 577 U.S. 190, 207 (2016).  Indeed, "[t]he need to incapacitate also applies with less force to younger offenders because . . . adolescent crime is a poor predictor of future criminal behavior, both because adolescents' characters are still developing and because adolescent crime is attributable, in part, to temporary inadequacies of the adolescent brain." *United States v. Ramsay*, 538 F. Supp. 3d 407, 423 (S.D.N.Y. 2021).  A Guidelines sentence here, or anything close

---

[10] Understanding A First Episode of Psychosis Young Adult: Get the Facts. 12 Dec 2023. Substance Abuse and Mental Health Services Administration (SAMHSA). Available at
https://www.samhsa.gov/resource/ebp/understanding-first-episode-psychosis-young-adult-get-facts

to it, would be an affront to the principles set forth in *Miller* and its progeny as well as the Sentencing Commission's recently adopted amendments.  As such, Mr. Bickford's young age at the time of the offense, compounded by his mental illness, warrants a significant downward departure, or, alternatively, a variance.

### IV.  A Sentence of 120 Months Would Not Create Any Unwarranted Sentencing Disparities

Courts must consider similarly situated to defendants to avoid unwarranted sentencing disparities.  18 U.S.C. § 3553(a)(6).  That said, there are some cases, such as this, where there are simply no appropriate comparator cases because the case presents such rare and unique facts.  Nonetheless, there are markers that we can still look to that are important to consider when fashioning a fair and just sentence in Mr. Bickford's case as compared to others.

One of those factors is that there was, fortunately, no loss of life in the instant case.  As a result, his sentence should reflect as much.  In Fiscal year 2022, the average length of a murder sentence in the Second Circuit was 227 months.  *See* U.S. Sent. Comm'n, *Statistical Information Packet, Fiscal Year 2022, Second Circuit*.[11]  Nor was this an outlier as in the year 2021, the average murder sentence was 210 months[12] and in 2020, it was 190 months.[13]  *See, e.g.*, *United States v. Bryant Brown*, 20 Cr. 12 (PAE) (S.D.N.Y. 2021) (sentencing defendant to 288 months after he shot and killed a 21-year-old marijuana dealer during a robbery and, despite his death, proceeded to commit other violent armed robberies in the aftermath before his arrest); *United States v. Martinez*, 991 F.3d 347 (2d Cir. 2021) (sentencing defendant – an MS13 member that ordered the killing of a rival gang member who was dating his ex-girlfriend – to a term of 240 months after participating in the death of an innocent and non-gang affiliated third party).  *But see United States v. Rashaad Conyers*, 15 Cr. 537 (VEC), ECF Dckt. 1194 (S.D.N.Y. 2017) (sentencing defendant – a high ranking member of the Young Gunnaz gang known for its involvement in various murders, attempted murders, drug trafficking and other offense – to 180 months after shooting a person in the back and crippling them while on parole).  Mindful of the seriousness of the offense, a sentence of 120 months would appropriately reflect that Mr. Bickford did not take a human life.

---

[11] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2022/2c22.pdf.

[12] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/2c21.pdf.

[13] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/2c21.pdf.

**V.      A Sentence of 120 Months Would Account for the Horrific Conditions of Confinement Mr. Bickford Has Endured While at MDC Brooklyn**

In the best of times, the conditions at in the Bureau of Prison's ("BOP") facilities are harsh. *See, e.g.*, *United States v. Saldana*, 17 Cr. 512, ECF No. 535 at 16–17 (S.D.N.Y. Sept. 10, 2019) (Wood, J.) ("I am aware the conditions at the MCC are very dreadful, and it is my intention to give every defendant who has suffered in that way a break because of that."). The conditions there have only worsened over time. The current, acute staffing shortages have created a crisis at MDC. Judge Furman recently found that "[d]ata provided by the Government (at the Court's direction) confirms that there have been severe staffing shortages at the MDC for years." *United States v. Chavez*, 22 Cr. 303 (JMF) (Jan. 4, 2024).

The staffing shortages and lockdowns only exacerbate the abysmal "physical conditions" at MDC, which, Judge Furman recently held, "have long been problematic." *Chavez*, *supra* (citing reports of mold, vermin, denial of light and heat, overflowing toilets, etc.). Judge Kaplan recently explained:

> Serving time over the past few years in [Essex and MDC] has been horrible. It is, in significant measure, the fault of a government which does not provide the facilities or the money to hire competent staff in sufficient numbers to run those facilities in a humane and effective manner. It's a problem we've been dealing with every day for a long time. A sentence of a year in those prisons today, although it's very hard to quantify, is ever so much worse than it would have been five years ago. It's just dreadful.

*United States v. Tontisabo*, 21 Cr. 701 (LAK) (Jan. 3, 2024), Sent. Tr. 39-40.

The impact of these egregious conditions came to a head in December 2023 when Mr. Bickford discovered an inmate who had attempted suicide bleeding out in his unit. Since "the emergency call button in the MDC's main building are not working – even though those buttons are the only way (other than yelling and banging) to call an officer in emergency situations during a lockdown," Mr. Bickford was left to provide life-saving treatment on his own. *Chavez*, *supra*, at 13-14 (citing Letter from Loretta E. Lynch at 4, *Federal Defenders of New York, Inc.*, No. 19-CV-660 (MKB) (E.D.N.Y. Nov. 30, 2023), ECF No 403 (reporting that the buttons remained "broken" as of November 30, 2023)). His courage and leadership at just twenty years old, under the weight of mental illness, a federal prosecution, and horrific conditions of confinement, should be considered when fashioning a fair and just sentence in this case.

Mr. Bickford has tried his best to take advantage of working and programming at MDC whenever possible. For example, Mr. Bickford has worked as a GED and SENTRY tutor at MDC for inmates studying to take the exam. Additionally, he has also participated in as many programs

as the staff shortages and lockdowns permit.  *See* Ex. G.  Mr. Bickford's rehabilitation while incarcerated under profoundly egregious conditions is commendable.

As this Court found of the teenage defendant in *Brito*, Mr. Bickford "presents himself as a different person than the 19-year-old" he was at the time of the offense as he now has "greater insight" into his mental illness, its symptoms, and how to manage it.  *Brito*, 16 cv. 7618 (PKC), ECF. No. 35 at 12.

## Conclusion

A Guidelines, or life, sentence for a teenager suffering from his first episode of psychosis would be unjust and incompatible with the directives of *Miller* and 18 U.S.C. § 3553(a).  Instead, when looking at the particular circumstances of this case and accounting for Mr. Bickford's now-managed mental illness, his repeatedly expressed remorse for his actions, his young age at the time of the offense, his low risk of recidivism, and the rehabilitation he has demonstrated while incarcerated, it is clear that a sentence of ten years followed by fifteen years of supervised release is sufficient to satisfy all the statutory sentencing factors in this case.

Respectfully submitted,

/s/ *Marisa K. Cabrera*

Marisa K. Cabrera
Jennifer L. Brown
Assistant Federal Defenders
Federal Defenders of New York

Cc:    AUSA Sarah Kushner
       AUSA Kaylan Lasky
       AUSA Matthew Hellman