UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

TREVOR THOMAS BICKFORD,

                    Defendant.

23 Cr. 91 (PKC)


## THE GOVERNMENT'S SENTENCING MEMORANDUM


DAMIAN WILLIAMS
United States Attorney
Southern District of New York
for the United States of America


Matthew J.C. Hellman
Sarah L. Kushner
Kaylan E. Lasky
Assistant United States Attorneys
    *Of Counsel*

## Table of Contents

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 5

    I.    The Offense Conduct ............................................................................................ 5

        A.    The Defendant's Radicalization and Plotting to Wage Violent Jihad ........................... 5

        B.    The Defendant Decides to Wage Jihad in the United States, and Conducts Extensive, Secret Research on Possible Targets and Means of Attack ...................................................... 7

        C.    The Defendant Travels to New York City in the Days Leading up to the Attack, and Makes His Final Attack Preparations .................................................................................. 10

        D.    The Defendant Attempts to Murder Three NYPD Officers Assigned to the Joint Federal-State Operation Near Times Square ..................................................................................... 12

        E.    The Defendant Admits to the Attack and His Jihadist Goals ...................................... 16

        F.    Additional Evidence of the Defendant's Radicalization is Recovered from the Scene of the Attack ............................................................................................................................ 17

        G.    The Victims ................................................................................................................. 19

            1.    Officer-1 ................................................................................................................ 19

            2.    Officer-2 ................................................................................................................ 20

            3.    Officer-3 ................................................................................................................ 21

            4.    Witness-1 and Witness-2 ...................................................................................... 22

    II.    Procedural History ............................................................................................... 23

    III.    The Guidelines Calculation ................................................................................ 25

        A.    The Government's *Pimentel* Letter ............................................................................ 25

        B.    The PSR ....................................................................................................................... 27

DISCUSSION ...................................................................................................................... 28

    I.    Applicable Law ..................................................................................................... 28

    II.    The Guidelines Sentence is 120 Years' Imprisonment ..................................... 28

        A.    The Defendant's Actions Warrant Application of the Terrorism Enhancement ......... 29

        B.    The Defendant is Properly in Criminal History Category VI ...................................... 39

    III.    A Sentence of at Least 600 Months' Imprisonment and the Imposition of Lifetime Supervised Release is Appropriate ...................................................................................... 41

        A.    The Nature and Seriousness of the Defendant's Conduct and the Need for Just Punishment Warrant a Sentence of at Least 600 Months' Imprisonment ............................ 41

        B.    The Defendant's Personal Circumstances Do Not Support a Sentence of Less Than 600 Months' Imprisonment ...................................................................................................... 44

        C.    A Sentence of at Least 600 Months' Imprisonment Will Avoid Creating Unwarranted Sentence Disparities ............................................................................................................ 49

D.   A Sentence of at Least 600 Months' Imprisonment is Necessary to Afford Adequate Deterrence, to Promote Respect for the Law, and to Protect the Public ............................. 53

CONCLUSION ........................................................................................................................ 57

### Table of Authorities

**Cases**

*Gall v. United States*, 552 U.S. 38 (2007) ................................................................. 28

*United States v. Alaa Sadeh*, No. 15 Cr. 558 (D.N.J.) .................................................. 54

*United States v. Alhaggagi*, 978 F.3d 693 (9th Cir. 2020) ............................................ 35

*United States v. Alimehmeti*, No. 16 Cr. 398 (S.D.N.Y. 2017) ............................ 39, 41, 48, 53

*United States v. Awan*, 607 F.3d 306 (2d Cir. 2010) ............................................. 29, 33

*United States v. Babafemi*, No. 13 Cr. 109, 2021 WL 1210313 (E.D.N.Y. 2021) .................... 58

*United States v. Badawi, et. al*, No. 15 Cr. 60 (C.D. Cal.) .......................................... 53

*United States v. Borho*, 485 F.3d 904 (6th Cir. 2007) ............................................... 49

*United States v. Bradley*, No. 21 Cr. 277 (PAE) (S.D.N.Y.) .................................. 39, 41, 48

*United States v. Ceasar*, 10 F.4th 66 (2d Cir. 2021) ......................................... 30, 54, 55

*United States v. Clark*, No. 20 Cr. 76 (NRB) (S.D.N.Y.) .................................... 39, 53, 58

*United States v. Cox*, 458 F. App'x 79 (2d Cir. 2012) ............................................... 47

*United States v. El Bahnasawy*, No. 16 Cr. 376 (RMB) (S.D.N.Y.) ............................... 39, 48

*United States v. Farhane, et al.*, No. 05 Cr. 673 (LAP) (S.D.N.Y.) ................................. 53

*United States v. Jabarah*, No. 02 Cr. 1560 (BSJ) (S.D.N.Y.) .................................. 48, 52

*United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011) ......................................... 56

*United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) .................. 59

*United States v. Juraboev*, No. 15 Cr. 95 (WFK), 2017 WL 5125523 (E.D.N.Y. Nov. 1, 2017) 49

*United States v. Kourani*, 6 F. 4th 345 (2d Cir. 2021) ............................................... 54

*United States v. Mateo*, 299 F. Supp. 2d 201 (S.D.N.Y. 2004) ...................................... 50

*United States v. Melzer*, No. 20 Cr. 314 (GHW) ................................................. 33, 52

*United States v. Mumuni Saleh*, 946 F.3d 97 (2d Cir. 2019) ............................ 30, 33, 35, 55

*United States v. Murad*, No. 93 Cr. 180 (LAK) (S.D.N.Y. May 15, 1998) ........................... 52

*United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) .............................................. 59

*United States v. Oussama Kassir*, No. 04 Cr. 356 (JFK) (S.D.N.Y. Sept. 15, 2009) ................. 52

*United States v. Pinto-Thomas*, 454 F. Supp. 3d 327 (S.D.N.Y. 2020) ............................... 50

*United States v. Pugh*, No. 15 Cr. 116 (NGG) (E.D.N.Y.) ............................................ 54

*United States v. Rahimi*, No. 16 Cr. 760 (RMB) (S.D.N.Y.) .................................... 40, 42

*United States v. Raishani*, No. 17 Cr. 421 (RA) (S.D.N.Y.) .................................... 42, 53

*United States v. Redzepagic*, No. 21-2993, 2023 WL 129886 (2d Cir. Jan. 3, 2023) ................. 36

*United States v. Reid*, No. 02 Cr. 10013 (WGY) (D. Mass. Jan. 30, 2003) ........................... 52

*United States v. Ressam*, 679 F.3d 1069 (9th Cir. 2012) ............................................. 56

*United States v. Robinson*, 669 F.3d 767 (6th Cir. 2012) ............................................ 49

*United States v. Saidakhmetov*, No. 15 Cr. 95 (WFK), 2018 WL 461516 (E.D.N.Y. Jan. 18, 2018)
...................................................................................................... 49

*United States v. Sayoc*, No. 18 Cr. 820 (JSR) (S.D.N.Y.) ........................................... 40

*United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) ................................................. 59

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) ........................................ passim

*United States v. Tsaernaev*, No. 13 Cr. 10200 (GAO) (D. Mass.) ..................................... 49

*United States v. Ullah*, No. 18 Cr. 16 (RJS) (S.D.N.Y.) ...................................... 39, 41, 51

*United States v. Williams*, No. 21 Cr. 99 (JCC) (W.D. Wa. Nov. 29, 2022) .......................... 35

*United States v. Woodberry*, No. 22-433, 2023 WL 3573759 (2d Cir. May 22, 2023)............... 50
*United States v. Zea*, 13 Cr. 72 (SJF) (E.D.N.Y.) ......................................................................... 54

**Statutes**
18 U.S.C. § 111(a)(1) and (b) ..................................................................................................... 24
18 U.S.C. § 1114 ............................................................................................................. 23, 29, 31
18 U.S.C. § 1512 ........................................................................................................................ 55
18 U.S.C. § 2332b(g)(5) ...................................................................................... 29, 31, 35, 36
18 U.S.C. § 3553 ........................................................................................................ 28, 42, 56, 59
18 U.S.C. § 3664(d)(5) ............................................................................................................... 25

**Other Authorities**
U.S.S.G. § 2A2.1 ......................................................................................................................... 25
U.S.S.G. § 2A2.2 ......................................................................................................................... 26
U.S.S.G. § 3A1.2(b) .............................................................................................................. 25, 26
U.S.S.G. § 3D1.2(a) ................................................................................................................... 26
U.S.S.G. § 3D1.3(a) ................................................................................................................... 27
U.S.S.G. § 3D1.4 ......................................................................................................................... 27
U.S.S.G. § 4A1.3 ......................................................................................................................... 41
U.S.S.G. § 5G1.1(a) .................................................................................................................... 27
Violent Crime Control and Law Enforcement Act of 1994 ........................................................ 30

## PRELIMINARY STATEMENT

The Government submits this memorandum in connection with the sentencing of defendant Trevor Thomas Bickford, scheduled for May 9, 2024. The defendant committed a terrorist attack during New Year's Eve celebrations in Times Square on December 31, 2022, and, in the process, attempted to murder three members of the New York City Police Department ("NYPD"). The applicable sentence, pursuant to the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G"), is 1,440 months', or 120 years', imprisonment. For the reasons that follow below, a substantial sentence of at least 600 months' imprisonment is appropriate.

In December 2022, Bickford, then a 20-year-old resident of Wells, Maine, traveled from his home in Maine to New York City, where he, in his own words, intended to wage jihad and kill as many of his targets as possible. After considering his options, researching his target location, and settling on his plan of attack, he packed a machete-like blade measuring more than a foot in length and went to one of the most densely populated areas in the United States at one of the most densely populated times—Times Square on New Year's Eve. He then ambushed three NYPD officers keeping watch over the gathered celebrants, declared "Allahu Akbar," and struck them with his blade. All three were left seriously injured. Soon after his rampage, the defendant declared that he carried out his attack to wage jihad and admitted that his goal was to kill as many military-aged men who worked for the U.S. Government as he could before himself becoming a martyr.

The defendant's brutal actions on December 31, 2022 were premeditated. In advance of his attack, Bickford sought and consumed materials espousing radical Islamic ideology—including materials promoting the Taliban and reflecting the teachings of Sheikh Abu Muhammad Al-Maqdisi, a prominent radical Islamic cleric who was a spiritual mentor of al Qaeda—and contemplated ways to wage jihad. As he immersed himself deeper into this propaganda, the

defendant devoted himself to violent Islamic extremism and pursuit of the jihad that he would eventually unleash on New York City. In the weeks leading up to his attack, the defendant explored traveling overseas to support the Taliban in Afghanistan or elsewhere. He planned to ally himself with the Taliban to fight against governments that, in the defendant's view, oppress Muslims, and to wage jihad against officials of governments that he believes are anti-Muslim, including the U.S. Government. Ultimately, the defendant decided that he would not travel overseas, and instead turned his attention to an attack here, in the United States. This decision resulted in the defendant's ferocious attack on December 31, 2022.

The defendant's assault has left his victims—including those he forced to witness and live through a terrorist attack—traumatized. One victim ("Officer-1") was working his first day after graduating from the NYPD academy. He suffered a skull fracture and laceration to the back of his head, received more than a dozen stitches, had to see numerous doctors, including a neurologist, has had multiple MRIs, and was out-of-work for more than three months after the defendant struck him in the head with a blade. The second ("Officer-2") continues to suffer pain from his injuries, constantly relives the trauma of his attack, and is afraid to return to Manhattan. The third ("Officer-3," and together with Officer-1 and Officer-2, the "Victim Officers") received multiple stitches from the wound the defendant caused, and continues to experience migraines, degraded speech and memory, and post-traumatic stress disorder. Officer-3 has not been able to return to full-time duty with the NYPD. Officer-3 has described that "everything" in his life has changed and that the events may end his career. All three victims expressed to the United States Probation Office (the "Probation Office") that they think life in prison is the appropriate sentence in this case.

Considering the defendant's egregious conduct, the Government respectfully submits that the Court should sentence the defendant to a term of at least 600 months' imprisonment. The

Government also submits that the Court should sentence the defendant to a lifetime of supervised release. Such a sentence is necessary and appropriate to reflect the extraordinarily serious nature of the defendant's terrorism offense, to provide just punishment for the defendant's conduct, to deter and prevent the defendant from resuming activities in support of radical terrorist ideology, and to deter others who, like the defendant, would seek to carry out brutal terrorist attacks on U.S. soil.

The Probation Office also recommends that the Court impose a sentence of 600 months' imprisonment, after considering the seriousness of the offense, including that "his mindset at the time of the offense, his detailed plan, and his goal on the date of the offense was to murder law enforcement officers before ending his own life," as well as the defendant's upbringing, mental and emotional conditions, lack of criminal history, young age, and expressed remorse. (Presentence Investigation Report ("PSR"), dated April 2, 2024, at p. 41.) The Probation Office concludes that "[t]hese factors point to the defendant's willful intent and require a significant term of imprisonment." (PSR at p. 41.)

The defendant, in seeking a sentence of 120 months' imprisonment—a 110-year variance, or less than 10% of a Guidelines sentence—and fifteen years' supervised release, argues that the defendant's crimes were a result of mental illness, and that the defendant is unlikely to recidivate, is rehabilitated, and was young when he committed the offenses. (Defense Sentencing Memorandum ("Def. Mem."), Dkt. 46, at 1.) The defendant also argues that the "terrorism enhancement" under U.S.S.G. § 3A1.4 should not apply because, while mental health problems did not prevent the defendant from forming the specific intent to murder NYPD officers, as he admitted at his guilty plea, these same mental health problems somehow prevented the defendant from forming the specific intent to kill NYPD officers to promote a federal crime of terrorism

(Def. Mem. at 16-19)—despite the defendant's contemporaneous and clear admissions to the contrary and the overwhelming evidence corroborating the defendant's single-minded pursuit of a jihadist-inspired attack on the United States. Finally, the defendant argues that he should not be placed in Criminal History Category VI—as required under the terrorism enhancement—and that the Court, as a departure or variance from the Guidelines, should treat the defendant as though he were in Criminal History Category I. (Def. Mem. at 19-20.)

A sentence of less than 600 months' imprisonment, let alone a sentence of 120 months' imprisonment—which would still be less than 40% of the low end of the Guidelines range even if the terrorism enhancement did not apply here (which it does, as further explained below)—would be entirely inappropriate and out of line with the defendant's conduct and with sentences imposed on similarly situated defendants. The defendant's crimes were premeditated and intentional. The defendant plotted to kill those who did not subscribe to the extremist strain of Islam he embraced. His goal was to kill as many military-aged men who worked for the U.S. Government as he could. On December 31, 2022, he attempted to accomplish this goal. He traveled to this community and waged violent jihad here in New York City by attempting to murder three NYPD officers who were trying to protect the community, so that he could die and become a martyr. The defendant fails to present any compelling justification that would counsel against imposing a lengthy sentence of imprisonment, and other factors in this case militate strongly in favor of a sentence of at least 600 months' imprisonment.

## BACKGROUND

### I.  The Offense Conduct[1]

#### A.  The Defendant's Radicalization and Plotting to Wage Violent Jihad

In the summer of 2022, the defendant converted to Islam and began frequenting mosques in and around Maine and New Hampshire.[2] (PSR ¶¶ 15, 17(a).) By the winter, the defendant had become radicalized, and was focused on traveling to Jordan or Afghanistan so that he could join the Taliban and become a martyr in the name of his strand of his religion. (PSR ¶¶ 15-16.) He purchased a crossbow, later recovered by federal agents from his home in Maine, that he planned to bring with him on any such trip, and practiced shooting every day, which he believed he was obligated to do according to his view of Islam. (PSR ¶ 15.) The defendant also booked a ticket to fly to Jordan on December 12, 2022, but did not ultimately board the flight. (PSR ¶ 16.)

Unfortunately, the defendant's decision to not fly to Jordan was far from the end of his path to jihad. Instead, his radicalization escalated. Evidencing this escalation, in early December 2022, after concluding that the mosques he had been visiting were not sufficiently radical, the defendant left handwritten notes at one of the mosques ("Mosque-1") for its members, warning the members

---

[1] The offense conduct summarized in the PSR and herein is based principally on interviews of the defendant, civilian witnesses, and law enforcement officers; a review of surveillance footage, the content of the defendant's electronic devices and online accounts; and evidence recovered from the area around Times Square after the defendant's arrest.

[2] The Taliban is an Islamic fundamentalist paramilitary organization and political movement, based principally in Afghanistan, which is dedicated to strict Islamic law or "Sharia," and is known for its violence. Among other things, as part of its deadly insurgency campaign to regain control of Afghanistan after losing power in 2001, as a result of the U.S.-led invasion of Afghanistan, the Taliban conducted numerous suicide bombings, targeted killings, assassinations, and hostage takings against U.S. military forces and American civilians.

that they were "not upon the saved path," and that if they were "sincere in [their] devotion to Allah," they would "reject democracy and openly declare [their] enmity and hatred for the kuffar and mushrikeen," that is, their hatred for non-believer infidels and polytheists. (PSR ¶ 19.) To help put them on the "saved" path, the defendant's note encouraged Mosque-1's members to read *Millat Ibrahim*, the infamous book by Muhammad Al-Maqdisi, which encourages, among other things, waging jihad against and using swords on the heads of disbelievers and governments ruled by disbelievers, and criticizes police and other agents of "man-made" governments as disbelievers and promoters of polytheism. (PSR ¶ 19.)[3]

By December 2022, disturbed by the defendant's increasing militancy, the defendant's family reported his behavior to law enforcement. (PSR ¶ 18.) In response to the outreach from the defendant's family, on December 13, 2022, agents from the Federal Bureau of Investigation ("FBI") conducted a voluntary interview of the defendant in Maine. (PSR ¶ 17.) During that interview, the defendant stated, among other things, the following:

---

[3] Al-Maqdisi is a prominent, radical cleric based in Jordan who preaches a militant form of Islam and opposes any type of democracy. (PSR ¶ 20.) He is one of the most influential living jihadi theorists, is credited with popularizing many of the contemporary themes of radical Islam, and was the mentor of Jordanian jihadist Abu Musab al-Zarqawi, the original leader of al Qaeda in Iraq. (PSR ¶ 20.) Al-Maqdisi has been imprisoned in Jordan multiple times, including on terrorism charges for conspiring to attack American targets in Jordan. (PSR ¶ 20.) He is a proponent of violent Salafi Islam, which teaches that most people on Earth, including most Muslims, are disbelievers and that true Muslims must fight and kill disbelievers. (PSR ¶ 20.) For followers of this violent extremist strand of Islam, Sharia law is the only acceptable form of governance, and any government ruling by something other than Sharia law and any person endorsing or participating in any such government must be violently opposed and unseated. (PSR ¶ 20.) Al-Maqdisi's radical teachings further promote the belief that by participating in a governmental system not run in accordance with Sharia law, all employees of such a government are polytheists, which is an unforgivable sin that may be punished by bloodshed. (PSR ¶ 20.) Al-Maqdisi has published various materials that promote his teachings, including the book that the defendant promoted, *Millat Ibrahim*, which is considered his most influential work. (PSR ¶ 20.)

- Several weeks earlier, the defendant had purchased tickets to fly to New Delhi, India, from where he planned to fly to Afghanistan. The defendant was planning to take that trip to "ally" with the Taliban and convince them to help him fight against the oppression of Muslims in Burma; he also claimed, however, that he did not agree with the Taliban's use of violence against civilians, and stated that he had no intention to join al Qaeda. He also mentioned fighting against the oppression of Muslims in China.

- The defendant was training with his crossbow to fight in the jungles of Burma.

- The defendant canceled his trip to Afghanistan in order to see one of his brothers, Devin Bickford,[4] a soldier in the U.S. military, who was coming to visit the defendant, but would likely rebook travel abroad the following week.

- The defendant stated that he read a lot of Salafist material and follows various Imams on YouTube, including a particular Sheikh, but appeared reluctant to discuss the Sheikh and claimed not to remember his name.

- The defendant also expressed some concern that going to Afghanistan was too dangerous and that he was considering traveling to Jordan to study under a particular Sheikh while attending an Islamic religious school, but refused to identify the Sheikh. When asked what he planned to bring with him to Jordan, the defendant stated that he would bring, among other things, camping gear, an old military bag, his iPhone (the "Cellphone"), and a laptop. The FBI then asked the defendant for his consent to view the contents of the Cellphone and laptop, but after reviewing a written consent form, the defendant refused.

(PSR ¶ 17). Around the same time as this interview, the defendant told Devin Bickford that the defendant was scared that he was going to go to federal prison. (Complaint ("Compl."), Dkt. 1 ¶ 15.)

### B. The Defendant Decides to Wage Jihad in the United States, and Conducts Extensive, Secret Research on Possible Targets and Means of Attack

In the days following that interview, the defendant accelerated his attack planning, and decided that, rather than travel to the Middle East as he initially planned, he would wage jihad in

---

[4] While the Government would ordinarily anonymize or redact this name, it has not done so here because the defendant's submission did not.

the United States instead. (PSR ¶ 21.) For at least more than a week leading up to his attack, in late December 2022—and as set forth in further detail below—the defendant extensively researched information about al Qaeda (including internet searches for "Al Qaeda recruitment," about waging jihad, and about his eventual time (New Year's Eve) and place (Times Square) of attack. (*See* PSR ¶ 22.) The defendant's internet research was chilling and included searches for "how often do the police patrol in NYC" and "New Years Eve 2023 itinerary in New York City Times Square." (PSR ¶ 22(d).) The defendant researched potential weapons he could use to carry out his attack, searching for how he could buy a gun on the black market. (PSR ¶ 22(d).) The defendant also researched various ways to hurt and kill people. For example, he researched "[w]hat are the terms for taking slaves in Islam" and whether Islam "permit[s] rape of female prisoners of war." (PSR ¶ 22(c).)

On December 23, 2022, further evidencing the calculated, pre-meditated nature of his conduct, and more than a week before the attack, the defendant downloaded to the Cellphone an encrypted application—Tor—that allows a user to access and browse the "dark web" without leaving an online footprint.[5] (PSR ¶ 22.) For the defendant, that encrypted application was not enough, as he also used a search engine designed for further anonymity, DuckDuckGo, which offers a number of products that are intended to protect a user's privacy online, including a private search engine and a tracker-blocking browser extension.[6] (PSR ¶ 22.) With two levels of attempted

---

[5] *What is Tor? A beginner's guide to the privacy tool*, the Guardian (Nov. 5, 2013), *available at* https://www.theguardian.com/technology/2013/nov/05/tor-beginners-guide-nsa-browser.

[6] *DuckDuckGo: What to Know About Google Search's Privacy-Focused Rival*, CNET (Apr. 25, 2023), *available at* https://www.cnet.com/tech/services-and-software/duckduckgo-what-to-know-about-google-searchs-privacy-focused-rival/.

anonymity in place, the defendant ran extensive searches on the Cellphone in connection with his plan to wage jihad. A list of those searches, which was extracted from the Cellphone, is attached hereto as Exhibit A. Examples of the defendant's searches are set forth below:

- **Al Qaeda:** The defendant extensively researched al Qaeda. Among other things, he researched how to join al Qaeda (*e.g.*, "how does al Qaeda recruit 2022," "how does Al Qaeda recruit," "Al Qaeda recruitment," "How does Al Qaeda recruit American Terrorists"); reviewed an article in *The Atlantic* titled "How does al Qaeda recruit American Terrorists"; searched where al Qaeda has "the most presence" and particular regions in the Middle East and in Asia where al Qaeda has an established presence; researched "where are Salafi jihadists in Jordan" and "Al-Zawahiri," a reference to Ayman al-Zawahiri, the former leader of al Qaeda who was killed last year; made numerous visits to the website run by the Global Islamic Media Front, a radical propaganda organization associated with al Qaeda; and searched "major jihadi website inciting attacks" as well as publications written by Al-Maqdisi and his current whereabouts.

- **Planning the New York City New Years' Eve Celebration Attack, Including Researching Obtaining a Gun:** In planning his attack, the defendant also researched information about New York City's New Year's Eve celebration and purchasing a gun in New York. For example, the defendant ran searches on his encrypted application about "New Years Eve 2023 itinerary in New York City" and "New Years Eve 2023 itinerary in New York City Times Square," as well as "what is the Times Square New Years Eve ball drop schedule for 2023," "where is the ball drop in NYC," "how often do the police patrol in NYC," and read an article about recent "bloody" attacks that had just occurred in New York City over Christmas, titled "Bloody Christmas Weekend Sees 6 Killed In New York City." The defendant also tried to buy a gun and ammunition on the black market, researching "how to make anonymous purchases online," "how to purchase off of the dark web," whether "you need to pass a background check for a used gun" or "to buy ammo in the United States," "Gun buying laws for New York City," "Do you need to pass a background check for a used gun," and "makeshift silencer." Relatedly, the defendant, knowing that he would be carrying out this attack in the name of his violent interpretation of his religion and that he hoped to become a martyr in carrying out the attack, researched whether the "Prophet"—that is, the Prophet Muhammad—"fast[ed] before battles," "what are the rules for fighting against apostates," "what is the interpretation of the rule regarding the killing of apostates," and "how much does a Muslim funeral cost near Portland Maine."

- **Rape and Enslavement of Women, Murder, and Other Harms:** The defendant's research also reflected a desire to harm others, including rape, slavery, and killing people or rendering them unconscious. For example, at the same time that the defendant was researching al Qaeda and his ultimate place of attack, he was also

researching "the rules on taking enemy women in war in Islam," "Islamic views on slavery," "can female prisoners of war be killed in Islam," "what are the terms for taking slaves in Islam," "how to treat the enemy women," "are you allowed to plunder enem[]y women in Islam," "can a Muslim share his slave woman," "does Islam permit rape of female prisoners of war," and "Muslim laws about killing captives," and visiting websites that purportedly help you find slaves to buy.[7] He also researched "the least easily identifiable causes of death," "how long does it typically take a medical examiner to come up with a cause of death," "least conspicuous causes of death in a homicide," and "Effective ways to kno[ck] someone unconscious."

(Ex. A; *see also* PSR ¶ 22.)

### C.  The Defendant Travels to New York City in the Days Leading up to the Attack, and Makes His Final Attack Preparations

On December 29, 2022, while conducting this research and crystalizing his plan for waging jihad, the defendant traveled from Maine to New York City, where he would carry out his attack two days later. (PSR ¶ 23.)

On December 31, 2022, before heading to Times Square, his point of attack, the defendant engaged in his final preparations for his planned martyrdom. That morning, he gathered his belongings, including his machete with a 13-inch blade, and checked out of the hotel where he had been staying the previous two days in downtown Manhattan. (PSR ¶ 27.) He then made several stops around Manhattan to complete the final tasks he had chosen to carry out before he martyred himself. (PSR ¶ 27.) This included, around 12:00 p.m., a stop at the Bowery Mission, where he gave away approximately $2,000 of the approximately $4,000 in cash he was carrying—a step that jihadists commonly take in an effort to ensure that they go to heaven when they become a martyr.

---

[7] The defendant's focus on attacking or taking women as slaves is consistent with the defendant's own recent admissions to a psychiatrist that, in addition to attacking military-aged men who worked for the U.S. Government, the defendant also "plan[ned] . . . to travel the country and attack drug dealers and prostitutes, as they were violating Shariah law." (Ex. A to Def. Mem. (Schouten Report) at 8.)

(PSR ¶ 28.) The defendant later claimed that he kept the remaining $2,000 to cover the expenses for his anticipated funeral. (PSR ¶ 28.)

Later that afternoon, at 4:05 p.m., the defendant took the subway to Midtown Manhattan, near Times Square. (PSR ¶ 29.) On his way to Times Square to carry out his attack, the defendant became concerned that law enforcement was following him, so he abandoned one of the bags ("Bag-1") that he had been carrying and continued towards Times Square. (PSR ¶ 29.) The defendant held onto another large bag ("Bag-2") that he was carrying, which contained the large blade he planned to use in the attack. (PSR ¶ 29.)

At approximately 8:29 p.m., the defendant arrived in the vicinity of 52nd Street and Eighth Avenue, depicted below, where he would carry out his attack less than two hours later:



West 52nd Street and 8th Avenue

There was a security checkpoint at that location, where law enforcement was regulating the pedestrian flow to Times Square itself. (PSR ¶ 26.) At the time, it was raining, there was a large crowd of people who had gathered to watch the New Year's Eve Times Square festivities, and the checkpoint to get closer to Times Square was closed. The defendant remained at that location, primed to commit his attack. (PSR ¶ 30.) Several civilians who were also waiting at the checkpoint (and were later interviewed by law enforcement) noticed and remembered the defendant from among the crowd because he was standing and getting soaked in the rain without appearing to care. One witness, who had traveled to Times Square from Europe for the celebrations, attempted to engage the defendant in casual conversation, but recalled that the defendant was "focused" and was not trying to participate in the celebrations going on around him.

As soon became tragically clear, the defendant was not participating in the celebrations. He was present for a very different reason and was instead steeling himself to commit his attack. Metadata from the Cellphone indicates that, at approximately 9:55 p.m., the defendant watched a video featuring Abdullah Yusuf Azzam, Usama bin Laden's mentor, in which Azzam states, among other things: "There is no excuse for you in front of Allah for staying away from battle— this rather increases your responsibilities and duties . . . . Even if you are alone! . . . If a man is facing alone a gathering of the mushrikeen, . . . even if you are alone, you have to fight!. . . there is no excuse for you." (PSR ¶ 30.) Soon after, the defendant followed Azzam's instructions.

### D.  The Defendant Attempts to Murder Three NYPD Officers Assigned to the Joint Federal-State Operation Near Times Square

As the defendant prepared to strike, crowds streamed around him, heading in the direction of Times Square for a chance to see the ball drop at midnight. Three on-duty NYPD officers, the Victim Officers, were watching over the crowds near the defendant. The Victim Officers were

stationed in the area of 52nd Street and Eighth Avenue and were part of the joint FBI-NYPD effort to ensure a safe New Year's Eve celebration in and around Times Square on December 31, 2022. (PSR ¶ 26.) At approximately 10:10 p.m., the defendant walked towards one side of the street and confirmed that two of the officers—who were providing directions to civilians, as depicted below, prior to Bickford appearing in the frame—were not watching him.[8]



The defendant then returned to the area where he had originally been standing, removed the blade from Bag-2, and snuck up behind the two officers with the blade in his hand.

At approximately 10:10 p.m., the defendant commenced his attack on the Victim Officers, bludgeoning each of them with his blade, and aiming in each instance for their heads. (PSR ¶ 31.) The defendant approached Officer-1, from behind, declared "Allahu Akbar—an Arabic phrase meaning "God is great," which other radical Islamic extremists have similarly proclaimed while

---

[8] This a still shot from a Victim Officer's body-worn camera, taken seconds before the attack. The civilians' faces have been redacted.

carrying out terrorist attacks—and struck Officer-1 directly in the head with the blade. (PSR ¶ 32.) The defendant then attacked Officer-2, striking him in the head, too. (PSR ¶ 32.) The defendant, wielding the blade above his head, then turned head-on towards and advanced at Officer-3, striking Officer-3 on the front of Officer-3's head. (PSR ¶ 32.) The defendant then set his sights again on Officer-2. (PSR ¶ 32.) As the defendant was about to attack Officer-2 again, however, Officer-2 was able to create some distance between himself and the defendant, remove his firearm from his waistband, and, firing only a single shot, hit the defendant in the right shoulder, stopping the defendant from attacking others. (PSR ¶ 32.) The defendant was then arrested and taken into custody. (PSR ¶ 32.)

A compilation of the Victim Officers' body-worn camera footage, showing the defendant's attack, is attached hereto as Exhibit B. Below are still shots from that footage, showing the defendant charging one of the officers (first image) and striking that officer with the defendant's blade (second image):



(Ex. B.)



(Ex. B.)

The Victim Officers were seriously injured and had to be taken to a hospital for treatment. (PSR ¶ 33.) Officer-1 suffered a skull fracture and laceration on the back of his head and received more than a dozen stitches to both his skull and scalp. (PSR ¶ 33.) Officer-2 suffered serious neck pain, shortness of breath, dizziness, and headaches from the attack. (PSR ¶ 33.) Officer-3, who had blood pouring down from his head into his eyes immediately after the attack, also suffered a serious laceration and required multiple stiches in his head. (PSR ¶ 33.) All three officers were forced to take leave from work due to the seriousness of their injuries and have suffered lasting effects, as set forth in further detail in Section I.G below. (PSR ¶ 33.) The blade used by the defendant was recovered by law enforcement from the scene of the attack, and is depicted below:



### E.  The Defendant Admits to the Attack and His Jihadist Goals

After receiving treatment at a local hospital, the defendant was cleared by medical personnel to be interviewed, waived his *Miranda* rights, and spoke with law enforcement agents. (PSR ¶ 35.) During the interview, the defendant stated, among other things, the following:

- In the days leading up to the New Year's Eve attack, the defendant traveled from Maine to New York City, where he checked into a hotel. While in New York City, he decided not to travel overseas to wage jihad as originally planned, and instead to commit jihad in New York City. (PSR ¶ 35(a).)

- On the night of December 31, 2022, prior to the attack, the defendant walked around Times Square "trying to figure out the right time to kill." The defendant spent a long period of time praying in the vicinity of Times Square before carrying out the attack. (PSR ¶ 35(b).)

- The defendant identified an NYPD officer who was directing traffic and waited until the officer was isolated from civilians and other police officers. The defendant started reciting Quran verses in his head to "hype himself up." The defendant took out the blade from his backpack, declared "Allahu Akbar," and attacked the officer. (PSR ¶ 35(c).)

- The defendant then charged at another officer and tried to forcibly remove that officer's firearm from the officer's holster.[9] The defendant had his hand on the

---

[9] During the attack, a civilian witness ("Witness-1") noticed the defendant struggling with one of the officers and appearing to try to pull the NYPD officer's gun from his holster. Witness-1's

handle of the firearm but was unable to remove it from the holster. The defendant was then shot in the shoulder, stopping his attack. (PSR ¶ 35(d).)

- When asked why he decided to attack the first officer, the defendant stated that the officer was a man in uniform who had a weapon; that all men of military age were his targets; that no one can work for the U.S. Government and be a true Muslim, because the U.S. Government supports Israel; and that he wanted to kill as many of these targets as he could. (PSR ¶ 35(e).)

- The defendant intended to die in the attack, in an effort to achieve martyrdom. The defendant believed his attack was unsuccessful, because he did not kill any officers, and he did not die himself. (PSR ¶ 35(e).)

- The defendant said that he acted alone in carrying out the attack, and that he was not affiliated with or working on behalf of any terrorist group. (PSR ¶ 35(f).)

- On the night of the attack, the defendant took the subway to Times Square. When he got off the subway in that area, prior to the attack, he abandoned a large hiking backpack—that is, Bag-1—that he was carrying because he was worried that plain-clothed police officers were following him. (PSR ¶ 35(g).)

### F. Additional Evidence of the Defendant's Radicalization is Recovered from the Scene of the Attack

Shortly after the attack, law enforcement officers recovered Bag-1 near Times Square, which contained, among other things, multiple books relating to Islam, including two copies of the Quran, camping gear, a survival kit, and warm clothing, including dark gloves and a hat. (PSR ¶ 36; Compl. ¶ 22.) One of the books contains highlighted language, including a passage, depicted below, that reads, "Fight in the Name of Allah and in the Cause of Allah. Fight against those who do not believe in Allah. Wage a holy war":

---

statement, redacted to remove Witness-1's personal identifying information, is attached as Exhibit C.

(Compl. ¶ 22.) Law enforcement also recovered Bag-2 from the scene of the attack. (PSR ¶ 36; Compl. ¶ 24.) Bag-2 contained a copy of *Millat Ibrahim* (Al-Maqdisi's book promoting jihad) and a journal (the "Journal") with the defendant's name and phone number written inside. (PSR ¶ 36.) The Journal contained an entry dated December 31, 2022, the day of the attack, depicted below, in which the defendant wrote, "this will likely be my last entry, insha'allah [God-willing]," further indicating that he intended and expected to die while waging jihad, and that he made the decision to commit himself to the attack long before he arrived at Times Square. The entry described to whom the defendant wanted to bequeath his possessions, and explained that the defendant wanted a traditional Muslim burial and did not want to be buried in the "land of the Kuffar."[10] (Compl. ¶ 24.) Also in this journal entry, the defendant addressed his brother, Devin Bickford, writing that the defendant had "no kind words" for Devin Bickford because Devin Bickford had "joined the ranks of my enemy"—that is, the U.S. military. (Compl. ¶ 24.)

---

[10] As noted above, *supra* at 3, "Kuffar" is often used as a pejorative term to refer to supposed non-believers.




### G. The Victims

In the course of the attack, the defendant tried to kill three NYPD officers, each of whom was seriously injured. The defendant's actions also seriously affected innocent civilians who witnessed his brutal attack.

#### 1. Officer-1

The defendant attacked Officer-1 on his first day after graduation from the NYPD Academy. (PSR ¶ 40.) Officer-1 had no prior warning that the defendant would attack him. (PSR ¶ 40.) Officer-1's initial reaction, after he was struck, was to help the other officers but the other officers advised him of his significant injuries and had him seek medical attention at a hospital. (PSR ¶ 40.) Officer-1 suffered a skull fracture and laceration on the back of his head and received more than one dozen stitches, to both his skull and scalp. (PSR ¶ 40.) He had to see numerous

different doctors since being discharged from the hospital, including a neurologist, and had to have at least two MRIs to ensure that his fracture was properly healing. (PSR ¶ 40.) He was out-of-work for around three and a half months and on limited duty for another month and a half. (PSR ¶ 40.) He reported no major long-term or residual health issues from his injuries (PSR ¶ 40), but in conversations with the Government, further explained that his skull fracture caused a throbbing sensation, he could not lift his head fully for over a month, and he still gets headaches one or two times a week that can last hours. He further noted that he was initially assigned to cover the most recent New Year's Eve celebration at Times Square but asked to be reassigned. Officer-1 explained that "[t]his was not the experience that you want on your first day" and he and the other officers "were lucky and fortunate." (PSR ¶ 40.) He added that his family and even his colleagues were terrified and very upset following the events of the attack. (PSR ¶ 40.) When asked about an appropriate sentence for this case, Officer-1 stated that he would "personally like to see life in prison" as he thinks it was "plain as day" what the defendant's intentions were. (PSR ¶ 40.)

### 2. Officer-2

Officer-2 graduated from the NYPD Academy in October 2022, just two months before the defendant tried to kill him. That night, Officer-2 was standing at a security post when out of nowhere, he saw the defendant's machete. (PSR ¶ 41.) He ducked, but the machete's handle hit his back and neck. (PSR ¶ 41.) When Officer-2 noticed the defendant returning to attack him again, Officer-2 was able to use his duty weapon to fire one round at the defendant. (PSR ¶ 41.) Officer-2's quick-thinking actions incapacitated the defendant's attack while minimizing risk to the innumerable innocent bystanders who easily might have become collateral victims of the defendant's assault. When other officers approached Officer-2, he was in shock and was taken to the hospital. (PSR ¶ 41.) Officer-2 suffered serious neck pain, shortness of breath, dizziness, and

headaches from the attack. Officer-2 was completely out of breath from the attack and felt like he "had been hit by a bus." (PSR ¶ 41.) He was dizzy, disoriented, and in immense pain. (PSR ¶ 41.) Officer-2 had multiple doctor appointments following his discharge from the hospital, including multiple appointments with an orthopedist, and continues to suffer from back pain and discomfort." (PSR ¶ 41.) His injuries required him to be out-of-work for close to two months and on a modified desk assignment for several additional months before he was able to return to full patrol assignments. (PSR ¶ 41.) Doctors have explained that he will most likely require surgery in the future. (PSR ¶ 41.) As a result of the attack, Officer-2 was afraid to return to Manhattan, constantly relieves the trauma of the attack, and is nervous and anxious in larger groups. When asked about an appropriate outcome of this case, Officer-2 stated that the defendant "had the intention of murdering all three of us if not more"; he often thinks about what would have happened to his family and the families of the other victims had the defendant been successful; and "anything short of life is not appropriate here." (PSR ¶ 41.)

### 3. Officer-3

Officer-3 was blindsided by the defendant's assault was fighting blacking out from his injuries. (PSR ¶ 42.) In conversations with the Government, Officer-3 noted that he heard the defendant repeat several words in a foreign language before the attack. Officer-3, who had blood pouring down from his head into his eyes immediately after the attack and was covered in blood following the attack, also suffered a serious laceration and required multiple stitches in his head. (PSR ¶ 42.) Officer-3 was given an IV on the way to the hospital and was brought to the trauma center at the hospital, where he received a CAT scan, and seven stitches on his forehead. (PSR ¶ 42.) Officer-3 reported that he continues to suffer from ringing in his ears, migraines, degraded speech and memory, and post-traumatic stress and "continues to see doctors, including an ear,

nose, and throat specialist and a neurologist. (PSR ¶ 42.) In conversations with the Government, in addition to the substantial injuries described above, the defendant still cannot lift heavy objects and is seeing a therapist for PTSD. Officer-3 still has not returned to full-duty since the attack and is currently in the process of applying for disability retirement from the NYPD. (PSR ¶ 42.) Officer-3 explained that "everything that has happened has changed my life, it's a major pivot point." (PSR ¶ 42.) He explained that it's not just about the injuries he received, but that the events of that night may "end my career." (PSR ¶ 42.) When asked about an appropriate outcome of this case, Officer-3 stated, "life in prison so he can never do this again to anyone else." (PSR ¶ 42.)

### 4. Witness-1 and Witness-2

The night of the attack, Witness-1 "was watching people gather" for the New Year's Eve festivities "from [his] apartment window with [his] 13-year-old daughter ("Witness-2")." (Ex. C.) "It was interesting seeing everyone enjoy their evening and it felt safe watching from our apartment." (Ex. C.) However, that all changed "[a] few moments later at the busiest time," when "we saw someone attacking a police officer." (Ex. C.) "[T]he speed and energy of the attack was deeply concerning and we instantly knew something very bad was happening." (Ex. C.) Witness-1 noted that, "[i]t wasn't until we saw the attacker reach for the police officer's gun that [he] realized, [his family was] not even safe in this apartment." Witness-1 "pushed [his] daughter to the ground and shortly afterwards heard a gunshot." (Ex. C.) Witness-1 explained the following about how the incident has continued to affect him and his daughter:

> Fast forward to today and our daughter is in therapy for anxiety, it's been a gradual decline from her usual bubbly personality to being very withdrawn and homebound. She's very nervous in public spaces, has had panic attacks on the subway and has a general fear of getting to and from school. Whilst we don't know if it's all related to December 31st it's hard to think otherwise as unfortunately this isn't her first

time witnessing an attack.[11] Attacking people at random leaves you with the thought, if it could happen to them it can happen to me. As a parent it's been challenging telling your child, everything will be OK as you don't really know. Witnessing a random act of extreme violence when all you were trying to do is enjoy an evening is very hard to describe.

Well done to the police officer [whose] quick thinking drew the attacker into the middle of the road and away from the crowd.

(Ex. C.)

## II. Procedural History

On January 10, 2023, the defendant was charged in a four-count Complaint with (1) attempted murder of officers and employees of the U.S. Government, in violation of Title 18, United States Code, Section 1114 (Count One), (2) attempted murder of officers and employees of the U.S. Government and persons assisting them based on the defendant's attempted murder of Officer-1, in violation of Title 18, United States Code, Section 1114 (Count Two), (3) attempted murder of officers and employees of the U.S. Government and persons assisting them based on the defendant's attempted murder of Officer-2, in violation of Title 18, United States Code, Section 1114 (Count Three), and (4) attempted murder of officers and employees of the U.S. Government and persons assisting them based on the defendant's attempted murder of Officer-3, in violation of Title 18, United States Code, Section 1114 (Count Four). (Dkt. 1.) On February 6, 2023, the

---

[11] Witness-1 separately explained to the Government that, by grim coincidence, his daughter, Witness-2, experienced terrorist violence before Bickford's attack when she was also victimized by Sayfullo Saipov's deadly terrorist attack on October 31, 2017, in which Saipov used a truck to murder eight victims and injure many more on a bike path in lower Manhattan. On that day, Witness-2 was outside playing during recess at her school in lower Manhattan, near the site of Saipov's attack. In the pandemonium that followed the attack, Witness-2's teachers told her to run, and she ended up getting separated from her sister; both of the children hid inside the school for approximately four hours.

defendant, who was hospitalized following the attack and held on state charges, was brought into federal custody on the charges in the Complaint and was detained on consent. (Dkt. 4; PSR ¶ 38.)

On February 15, 2023, a grand jury in this District returned a seven-count Indictment charging the defendant with the same four charges as those set forth in the Complaint and three additional charges—specifically, three counts of assault of officers and employees of the U.S. Government and persons assisting them based on the defendant's attack against Officers-1, -2, and -3, respectively, in violation of Title 18, United States Code, Sections 111(a)(1) and (b) (Counts Five through Seven). (Dkt. 6.)

In July 2023, the defendant filed a motion to dismiss the Indictment on the grounds that the Indictment was multiplicitous and requesting that the Court order the Government to proceed on either Count One or Counts Two through Four of the Indictment. (Dkt. 27.) On September 26, 2023, the Court granted the motion (Dkt. 32); on October 10, 2023, the Government informed the Court that it would proceed on Counts Two through Four of the Indictment, and consented to the dismissal of Count One. (Dkt. 33.). On October 12, 2023, the Court dismissed Count One. (Dkt. 34.) Trial was scheduled to begin on March 18, 2024. (*See* Dkt. Entry dated Sept. 13, 2023.)

On January 11, 2024, the defendant pled guilty, without the benefit of a plea agreement, to all remaining counts in the Indictment (that is, three counts of attempted murder of U.S. officers and employees and persons assisting them (Counts Two, Three, and Four) and three counts of assault of U.S. officers and employees and persons assisting them (Counts Five, Six, and Seven)). At the plea proceeding, the defendant admitted, "On December 31, 2022, I attempted to kill three uniformed NYPD Officers in an attack with a knife while they were working in Manhattan," and

confirmed that he knew the police officers were working at the time he attacked them. (Plea Tr. at 20).[12]

## III. The Guidelines Calculation

### A. The Government's *Pimentel* Letter

Prior to the defendant's guilty plea, the Government provided the defendant with a *Pimentel* letter setting forth the Government's position regarding the application of the Guidelines, as set forth below:

**<u>Offense Level</u>**

1. The applicable Guidelines manual is the November 1, 2023 Guidelines manual.

<u>Counts Two Through Four</u>

2. The Guideline applicable to Counts Two through Four is U.S.S.G. § 2A2.1. Pursuant to U.S.S.G. § 2A2.1(a)(1), the base offense level for each count is 33 because the object of the offense would have constituted first degree murder.

3. Pursuant to U.S.S.G. § 2A2.1(b)(1)(B), a two-level increase applies because the victim in each count sustained serious bodily injury.

4. Pursuant to U.S.S.G. § 3A1.2(b), a six-level increase applies because the victim in each count was a government officer or employee and the offense of conviction was motivated by such status, and the applicable Chapter Two Guideline is from Chapter Two, Part A.

---

[12] The Government has reached out to the Victim Officers and Witness-1 to confirm whether they wish to seek restitution and, if so, to determine the applicable amount; the Government will also confer with defense counsel to obtain their position before submitting a proposed order to the Court. If the Government is able to propose a restitution order to the Court by sentencing, it will do so in a supplemental filing. Alternatively, the Government will respectfully request that the Court defer final determination of restitution for up to 90 days following sentencing pursuant to 18 U.S.C. § 3664(d)(5), to ensure the victims have sufficient opportunity to provide the relevant information to the Government. In that event, the Government would propose to provide the Court with an update as soon as practicable and no later than 30 days following sentencing as to whether each of the victims are seeking restitution and in what amount(s), and the Government will submit a proposed restitution order to the Court as soon as feasible.

5. Pursuant to U.S.S.G. § 3A1.4, a 12-level increase applies because each offense is a felony that involved, or was intended to promote, a federal crime of terrorism.

6. Accordingly, the offense level for Counts Two, Three, and Four is 53.

<u>Counts Five Through Seven</u>

7. The Guideline applicable to Counts Five through Seven is U.S.S.G. § 2A2.2. Pursuant to U.S.S.G. § 2A2.2(a), the base offense level for each count is 14.

8. Pursuant to U.S.S.G. § 2A2.2(b)(1), a two-level increase applies because the assault involved more than minimal planning.

9. Pursuant to U.S.S.G. § 2A2.2(b)(2)(B), a four-level increase applies because a dangerous weapon was used.

10. Pursuant to U.S.S.G. § 2A2.2(b)(3)(B), a five-level increase applies because the victim in each count sustained serious bodily injury.

11. Pursuant to U.S.S.G. § 2A2.2(b)(7), a two-level increase applies because the defendant was convicted under 18 U.S.C. § 111(b).

12. Pursuant to U.S.S.G. § 3A1.2(b), a six-level increase applies because the victim in each count was a government officer or employee and the offense of conviction was motivated by such status, and the applicable Chapter Two Guideline is from Chapter Two, Part A.

13. Pursuant to U.S.S.G. § 3A1.4, a 12-level increase applies because each offense is a felony that involved, or was intended to promote, a federal crime of terrorism.

14. Accordingly, the offense level for Counts Five, Six, and Seven is 45.

<u>Combined Offense Level</u>

15. Pursuant to U.S.S.G. § 3D1.2(a), Counts Two and Five are grouped together because they involve the same victim and the same act or transaction ("Group 1"); Counts Three and Six are grouped together because they involve the same victim and the same act or transaction ("Group 2"); and Counts Four and Seven are grouped together because they involve the same victim and the same act or transaction ("Group 3").

16. Pursuant to U.S.S.G. § 3D1.3(a), the offense level applicable to each of Groups 1, 2, and 3 is 53, *i.e.*, the highest offense level of the counts in each Group.

17. Pursuant to U.S.S.G. § 3D1.4(a), Group 1 counts as one Unit. Groups 2 and 3 each count as one additional Unit because they each have an offense level that is equally

serious as the offense level for Group 1. Accordingly, there are a total of three Units.

18. Pursuant to the table set forth in U.S.S.G. § 3D1.4, the combined offense level is 53—that is, the offense level applicable to Group 1, the Group with the highest offense level—plus a three-level increase to account for the total number of Units. Accordingly, the total combined offense level for Counts Two[13] through Seven is 56.

In accordance with the foregoing calculations, the applicable offense level is 56. The offense level is treated as 43, however, pursuant to Chapter 5, Part A (comment n.2).

**Criminal History Category**

Based upon the information now available to this Office, the defendant has zero criminal history points. Pursuant to U.S.S.G. § 3A1.4, however, because the offenses charged in Counts Two through Seven are felonies that involved, or were intended to promote, a federal crime of terrorism, the defendant's Criminal History Category is VI.

**Sentencing Range**

Based upon the calculations set forth above, the defendant's applicable Guidelines range would be life imprisonment. Pursuant to U.S.S.G. § 5G1.1(a), however, because the statutorily authorized maximum sentence for Counts Two through Seven is 120 years' imprisonment, the applicable Guidelines sentence is 120 years' imprisonment.

(PSR ¶ 11.)

**B.  The PSR**

On April 2, 2024, the Probation Office issued the PSR. The PSR calculates the applicable Guidelines consistent with the calculation set forth in the *Pimentel* letter, as set forth above, and also applies a three-point reduction for acceptance of responsibility, resulting in a total offense level of 43. (PSR ¶¶ 46-76, 79-81, at p. 39.)

---

[13] A typographical error in the *Pimentel* letter that lists Count One, rather that Count Two, has been corrected above.

## DISCUSSION

### I.  Applicable Law

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). After that calculation, a sentencing judge must consider the seven factors outlined in 18 U.S.C. § 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant"; the four legitimate purposes of sentencing, as set forth below; "the kinds of sentences available"; the applicable Guidelines range itself; any relevant policy statement by the Sentencing Commission; "the need to avoid unwarranted sentence disparities among defendants"; and "the need to provide restitution to any victims." 18 U.S.C. § 3553 (a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553 (a)(2).

### II.  The Guidelines Sentence is 120 Years' Imprisonment

The defendant argues that (i) the "terrorism enhancement" under U.S.S.G. § 3A1.4 should not apply because the defendant lacked the requisite specific intent to commit an act of terrorism because "his words and actions arose out of his mental illness" (Def. Mem. at 17), and (ii) the

Court, as a departure or variance from the Guidelines, should treat the defendant as though he were in Criminal History Category I rather than Criminal History Category VI (Def. Mem. at 19-20.) The defendant's arguments are meritless, inconsistent with the defendant's plea allocution, and contradicted by the facts of this case and well-established law. As set forth in the PSR, and consistent with the Government's *Pimentel* letter, U.S.S.G. § 3A1.4 applies, and the applicable Guidelines sentence is thus the statutory maximum sentence of 120 years' imprisonment.

### A.  The Defendant's Actions Warrant Application of the Terrorism Enhancement

Section 3A1.4 applies where an offense "is a felony that involved, or was intended to promote, a federal crime of terrorism," U.S.S.G. § 3A1.4(a), which is "an offense that—(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and (B) is a violation of—(i) section . . . 1114." 18 U.S.C. § 2332b(g)(5); *see United States v. Awan*, 607 F.3d 306, 311 (2d Cir. 2010). Where the enhancement applies, a sentencing court must increase the offense level by 12 levels (or to 32 if the resulting offense level is less than 32), and must increase the defendant's Criminal History Category to Category VI. U.S.S.G. § 3A1.4(a). The genesis of the terrorism enhancement was Congress's 1994 directive that the Sentencing Commission establish a Guidelines enhancement for terrorism offenses to ensure that those convicted of such crimes receive punishment commensurate with the extraordinary nature of their conduct. *See United States v. Stewart*, 590 F.3d 93, 172 (2d Cir. 2009) (Walker, J., concurring in part and dissenting in part) (citing Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 120004, 108 Stat. 1796, 2022). The resulting terrorism enhancement at U.S.S.G. § 3A1.4 reflects Congress's intent that defendants—like this defendant—who are convicted of terrorism offenses serve sentences that are appropriate in light

of the extreme dangerousness of their crimes and the unique risk of recidivism that they present.

As Judge Walker explained in his concurrence in *Stewart*:

> The import of this enhancement "could not be clearer": It reflects Congress' and the Commission's policy judgment "that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time."

*Id.* at 172-73 (quoting *United States v. Meskini*, 319 F.3d 88, 91-92 (2d Cir. 2003); *United States v. Ceasar*, 10 F.4th 66, 79 (2d Cir. 2021). "Moreover, when it comes to sentencing terrorism, Congress and the United States Sentencing Commission plainly intended for the punishment of crimes of terrorism to be significantly enhanced without regard to whether, due to events beyond the defendant's control, the defendant's conduct failed to achieve its intended deadly consequences." *United States v. Mumuni Saleh*, 946 F.3d 97, 112-13 (2d Cir. 2019). In other words, the terrorism enhancement was designed to enhance the punishment of defendants just like this defendant, whose crimes are among the most dangerous and difficult to deter or rehabilitate.

When the defendant attempted to kill three NYPD officers in the name of jihad, the defendant committed offenses involving federal crimes of terrorism. He has been convicted of attempted murder under 18 U.S.C. § 1114, which is an enumerated offense under § 2332b(g)(5)(B). As set forth below, the defendant's actions, his statements after carrying out these crimes, the radical literature he brought to the attack location, and the encrypted search history on his phone make clear that his objective and specific intent was to influence or affect the conduct of government by intimidation and also to retaliate against government conduct—sufficing to establish either prong of the terrorism enhancement. Thus, there is overwhelming evidence in this

case that the defendant's attempts to kill the three NYPD officers involved or was intended to promote a federal crime of terrorism under U.S.S.G. § 3A1.4.

The defendant's motives in carrying out the attack are clear by his actions and words and are more than sufficient to establish either prong of the terrorism enhancement. In the weeks preceding the attack, the defendant consumed extremist materials espousing radical Islamic ideology, including materials promoting the Taliban and reflecting Al-Maqdisi's teachings. And in the week before the attack, the defendant used a secret application on the Cellphone to conduct extensive research relating to his plan to wage jihad. These were not—as the defendant asserts—"random" Internet searches. (Def. Mem. at 12.) Far from it, these were deliberate, targeted actions by someone hellbent on doing exactly what the defendant did—committing an act of terror in New York City against what he considered to be an enemy government. The searches included, among many other things, the New Year's Eve celebration at Times Square, al Qaeda and al Zawahiri, a "major jihadi website inciting attacks," whether the Prophet Muhammad fasted before battles, "what are the rules for fighting against apostates," and "how much does a Muslim funeral cost near Portland Maine." (Ex. A.) These searches clearly reflect the defendant's well-considered plans to conduct a terrorist attack in New York City on New Year's Eve. The items that the defendant brought to the attack, including Al-Maqdisi's notorious text promoting jihad and the defendant's journal, in which he described non-believers as "kuffars" and his brother as having joined the "enemy" (*i.e.*, the U.S. military), further support that the attack was specifically calculated to impact U.S. foreign policy, and to intimidate and retaliate against the U.S. Government. That evening he scouted out the area near Times Square, in his words, "trying to figure out the right time to kill," engaged in pre-attack prayers, watched an al Qaeda video to motivate himself to carry out his planned attack, and scoped out potential targets. He then ambushed the Victim Officers,

declared "Allahu Akbar," and savagely struck each in the head with his machete. The defendant later proudly declared to interviewing agents that he carried out his attack to wage jihad and admitted that his goal was to kill as many military-aged men who worked for the U.S. Government as he could before himself becoming a martyr. Additionally, he informed one of the defense experts, Dr. Ronald Schouten, that he expected that he would either be shot and killed, or he would be captured and exchanged for Americans being held by the Taliban. (Ex. A to Def. Mem. (Schouten Report), at 10). The record easily establishes by a preponderance of the evidence (and well more) that the terrorism enhancement applies in this case.

While the defendant now argues that this behavior indicates his "thoughts and actions" were not governed by "radicalization or extremism," those explicit thoughts and actions permeated the offense conduct, from his methodical research to the attack itself. (Def. Mem. at 18.) A purposeful violent attack against military-aged U.S. Government personnel (based on their status as such) clearly falls within the category of conduct contemplated by the terrorism enhancement because its goal was to influence or affect the conduct of government by intimidation or coercion. *See, e.g.*, *United States v. Melzer*, No. 20 Cr. 314 (GHW), Dkt. 171 at 7 (applying terrorism enhancement where defendant attempted to murder dozens of American soldiers by enabling terrorists to commit attacks through the exploitation of sensitive and classified information he disclosed to others).

The defendant claims that he lacked the requisite specific intent to commit an act of terrorism because "his words and actions arose out of his mental illness." (Def. Mem. at 17.) In so doing, the defendant tries to insulate himself from the straightforward application of the terrorism enhancement by arguing that he was incapable of forming the specific intent to commit an act of terrorism due to his mental health issues. At the same time, however, the defendant agrees, as he

must and as is consistent with his sworn plea allocution, that he had the specific intent to commit three counts of attempted murder and three counts of assault of U.S. Government officials and employees or persons assisting them. *See Mumuni Saleh*, 946 F.3d at 108 ("[A]n attempt to commit murder requires a specific intent to kill."). Just as the defendant was capable of forming specific intent to commit the crimes to which he pled guilty, he was also capable of forming the specific intent required under U.S.S.G. § 3A1.4.

As the defendant's brief recognizes, the terrorism enhancement is read to apply in situations in which "the *underlying felony* [is] calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.'" (Def. Mem. at 17) (quoting *Awan*, 607 F.3d at 317) (emphasis in original). The defendant also maintains that he was capable of forming the specific intent to kill the police officers because of their official status, and did in fact form that intent and act on it. (Def. Mem. At 11) (explaining that on December 30, 2022, the defendant "believed he received a message from God to attack officers in Times Square using the kukri knife he brought with him."). Despite his extensive preparations for the attack, including viewing a video of a famous radical cleric exhorting followers to violent lone-wolf jihadist attacks up to the minute of the attack, and his admission that the attack was jihadist-inspired, the defendant's new explanation for his attack (*i.e.*, that God generally encouraged it) is unconvincing and belied by the overwhelming evidence, which demonstrates that this was, in fact, a jihadist-inspired attack targeting persons assisting the U.S. Government during a nationally-televised and well-attended event. In other words, a terrorist attack against the United States.

Notwithstanding the clear evidence undermining the defendant's recent claim, the defendant generally misreads the terrorism enhancement to require a form of intent distinct from the underlying offense. That is especially true here, where the defendant's precise targeting of

officials securing the event also required specific intent. Because the defendant has admitted he could, and did, choose a class of victims based on their official status (Def. Mem. at 11), it follows that the defendant was capable of forming the requisite intent to attack those victims to influence or affect the conduct of government by intimidation or coercion, thus warranting the application of U.S.S.G. § 3A1.4.

Mental health issues suffuse many cases involving violent incidents by young, radically-motivated actors, a selection of which are described later in this section. They do not preclude the application of the terrorism enhancement. Importantly, none of the defendant's experts has opined that the defendant lacked the capacity to form the requisite *mens rea*, but instead have noted that his mental health was a significant aggravating element to his months-long quest to become a radical Islamist thinker and agent. Against this backdrop, and considering the defendant's guilty plea, the overwhelming evidence of the defendant's intent to attempt to murder officers and employees of the U.S. Government and persons assisting them, and to do so in a manner that was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct, as described in detail above, the Court should reject the defendant's challenges and apply the terrorism enhancement. *See Mumuni Saleh*, 946 F.3d at 113 ("Where a district court has accepted a defendant's guilty plea and his allocution to the elements of each charged offense, it cannot make findings of fact during sentencing that contradict or otherwise minimize the conduct described at the defendant's plea hearing.").

The defendant's reliance on *United States v. Alhaggagi*, 978 F.3d 693 (9th Cir. 2020), and *United States v. Williams*, No. 21 Cr. 99 (JCC) (W.D. Wa. Nov. 29, 2022), Dkt. 43, which followed its reasoning, is misplaced. (Def. Mem. at 18-19.) *Alhaggagi* is not controlling in this Circuit. Moreover, it does not support finding the terrorism enhancement inapplicable on the facts of this

case, which, unlike *Alhaggagi*, does not concern "non-violent" conduct. Here, the defendant violently attacked three NYPD officers after at least weeks of escalating extremist jihadi ideology and careful research and preparation, all with a focus on carrying out a terrorist attack and becoming a martyr. In stark contrast to this case, *Alhaggagi* involved a defendant convicted of attempting to provide material support to ISIS by opening six social media accounts for ISIS sympathizers. *See id.* at 694-95. The court in *Alhaggagi* concluded that the Government had not established that the defendant's non-violent material support offense was intended to influence government conduct under § 2332b(g)(5)(A)(1), and explicitly noted that "[i]n cases involving violent acts of terrorism, specific intent is relatively easy to identify, *either from the statements or admissions of the defendant or the nature of the offense.*" *Id.* at 701 (emphasis added). This case, of course involves a violent terrorist attack, and, as set forth above and by the defendant's unambiguous admission, his conduct was calculated to affect and retaliate against government conduct. This reasoning is thus entirely consistent with applying the terrorism enhancement here. Finally, *United States v. Redzepagic,* No. 21-2993, 2023 WL 129886, at *13, *33 (2d Cir. Jan. 3, 2023), which is also cited by the defense, has no bearing on whether the terrorism enhancement applies here. (Def. Mem. at 18). In *United States v. Redzepagic*, in which a defendant attempted to enter Syria and wage jihad on behalf of two designated foreign terrorist organizations, the district court in fact applied the terrorism enhancement, and the application of the terrorism enhancement was not challenged on appeal, Dkt. 100-1 at 3-5.

The defendant's attempt to differentiate his case because he purportedly "immediately renounced his acts and expressed remorse when he started his medication" is a meritless effort at distraction. (Def. Mem. at 18.) While the defendant asserts that he is remorseful and no longer ascribes to radical Islamist beliefs, even if true, these statements do not bear on the application of

the terrorism enhancement, which asks if his conduct—*at the time it was committed*—was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. 18 U.S.C. § 2332b(g)(5)(A). While the Court is of course free to take the defendant's purported remorse into account in weighing the § 3553(a) factors, there is simply no question here that the terrorism enhancement applies. The defendant's position here is that he has renounced his formerly held beliefs, and did so swiftly after his arrest and indictment on numerous federal and state charges. But that only means that he in fact previously held those beliefs. Indeed, the evidence shows those beliefs were powerful and clear to him when he executed his attack. The reasons for his assault were not incoherent or the product of any fugue state, he formed them following at least weeks of escalating radicalization, extensive research, efforts to conceal and operate in secret, planning, and preparation. Taking the defendant at his word that he is no longer motivated by radical Islamic fundamentalist beliefs and terrorist aims means accepting that he once was, and that is why the terrorism enhancement applies here.

Relatedly, the defense argues that the defendant evidenced a "lack of calculation" and "erratic conduct" that cannot have been calculated to influence or affect the conduct of government. (Def. Mem. at 18.) This, too is incorrect. *First*, as explained above, the attack was intensely premeditated. It was the product of clear deliberation, even if the specific plan for a domestic attack only developed over the course of a matter of weeks. The evidence proves it was not an unthinking or random course of conduct. Though, as noted above, the defense derides the evidence of the defendant's expansive internet search history as "random," it ignores the importance of the internet search history to the question of the terrorism enhancement. In addition to the consciousness of guilt and evasion of law enforcement exemplified by the defendant's use of encrypted applications marketed specifically to avoid governmental monitoring and to frustrate

law enforcement, the substance of the defendant's searches is all of a piece. The defendant methodically researched topics—in the main, jihadist violence and the justifications for it—sharing a radicalized theme. The searches regarding violent war-making, extreme violence (including rape and murder) against women, and enslavement of various groups that have been conquered by jihadists (or otherwise taken as slaves after battle) are all linked by the defendant's interest in engaging in violent dominance against groups that did not share his concept. Far from random or indicative of a confused or undisciplined mind, the searches show how consumed the defendant became with his violent goals, the measures he took to avoid scrutiny and cover his tracks, and further support the conclusion that the defendant committed his crimes squarely within the meaning of the terrorism enhancement. In light of this very clear conduct, the defense's attempts to distinguish himself from, as they put it, "actual terrorists," fall flat. (Def. Mem. at 17.)

*Second*, the requirement of "calculation" is a specific intent requirement relating to the defendant's knowledge or state of mind in the time period in which he acted. It is not synonymous with a more colloquial meaning of "planned," as the defense would suggest, such that in order for the terrorism enhancement to apply, the Government must prove that the defendant had been plotting just this specific attack—rather than other possible attacks—for months or years. However quickly the plan concretized, the defendant most certainly made a conscious decision to act in a manner that was calculated both to influence or affect the conduct of government, and to retaliate against government conduct.

The defendant planned to attack Times Square on New Year's Eve. As he admitted under oath during his plea proceeding, he "attempted to kill three uniformed NYPD officers" during his attack. (Plea Tr. at 20). These were not random targets; the defendant had researched police patrols in New York City and, after his attack, proclaimed that no one working for the U.S. Government

could be a true Muslim owing to the U.S. Government's support for Israel. The defendant's intent

is clear in his words and actions; he committed his attack "calculated to influence or affect the

conduct of government by intimidation or coercion" and "to retaliate against government conduct."

The terrorism enhancement should apply, as it has applied in a number of situations with varied

factual underpinnings in this district. *See, e.g.*, *United States v. Bradley*, No. 21 Cr. 277 (PAE)

(S.D.N.Y.), Dkt. 112 at 6 (applying terrorism enhancement in case involving 18-year-old convert

to Islam who attempted to travel to Yemen to join ISIS and argued that he had been rehabilitated

at the time of sentencing); *United States v. Alimehmeti*, No. 16 Cr. 398 (PAE) (S.D.N.Y.), Dkt.

133 at 9 '(rejecting challenge to application of terrorism enhancement to material support offense

involving defendant's attempt to facilitate travel of undercover agent to join ISIS, and specifically

rejecting argument that Government had failed to show defendant's conduct was directed at

impacting government conduct, based on finding that "Alimehmeti was aware of the undercover's

purported affiliation with ISIS and that his actions were aiding that cause"); *United States v. Clark*,

No. 20 Cr. 76 (NRB) (S.D.N.Y.) , Dkt. 32 at 3-4 (applying terrorism enhancement, and rejecting

defense argument that it resulted in overstated offense level and criminal history category, in case

involving defendant with drug dependency and extensive mental health history who supported

ISIS through disseminating propaganda online); *United States v. Ullah*, No. 18 Cr. 16 (RJS)

(S.D.N.Y.), Dkt. 116 at 10-13 (finding that terrorism enhancement applied, and rejecting defense

argument that defendant's conduct was not calculated to affect government conduct, where

defendant had attempted to carry out lone-wolf attack in the name of ISIS by detonating a pipe

bomb in a subway station in Manhattan); *United States v. El Bahnasawy*, No. 16 Cr. 376 (RMB)

(S.D.N.Y.) (Sent. Tr. available at *United States v. El Bahnasawy*, No. 18-3806, Dkt. 67-2)

(applying terrorism enhancement over defense objection in case involving 19-year-old defendant

with mental health and addiction history was convicted of conspiring to carry out terrorist bombing on behalf of ISIS in New York City); *United States v. Rahimi*, No. 16 Cr. 760 (RMB) (S.D.N.Y.), Dkt. 207 at 20 (applying terrorism enhancement where defendant was convicted of carrying out terrorist bombings in Chelsea neighborhood of Manhattan and New Jersey); *United States v. Sayoc*, 18 Cr. 820 (JSR) (S.D.N.Y.), Dkt. 48 at 2-3 (applying terrorism enhancement where defendant with mental health history mailed 16 improvised explosive devices to public officials, which did not result in injury). In sum, the Court should reject the defendant's application to the terrorism enhancement, and instead adopt the offense level calculation contained in the *Pimentel* letter and PSR.

## B.  The Defendant is Properly in Criminal History Category VI

The defense also argues that the defendant should not be placed in Criminal History Category VI—as required when the terrorism enhancement applies—because there is no empirical evidence supporting that automatic placement and because the defendant does not have any prior criminal convictions. (Def. Mem. at 19-20.) Alternatively, the defense argues, the Court, as a departure from the Guidelines, should treat the defendant as though he were in Criminal History Category I. (Def. Mem. at 20.)

The defendant's arguments simply boil down to his opinion that the terrorism enhancement yields results that are unduly harsh, and is bad policy. But the Guidelines apply even if the defense disagrees with them, and as discussed at greater length above, courts in this Circuit have repeatedly upheld the application of the enhancement in terrorism cases, rejecting precisely these sorts of arguments. *See, e.g.*, *Stewart*, 590 F.3d at 143 (citing *Meskini*, 319 F.3d at 92). In particular—

> Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the

> criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time. Thus, the terrorism guideline legitimately considers a single act of terrorism for both the offense level and the criminal history category.

*Meskini*, 319 F.3d at 92. "Considering the serious dangers posed by all forms of terrorism, the Guidelines are in no way irrational in setting the default for criminal history at a very high level, with downward departures permitted in exceptional cases." *Id.* (citing U.S.S.G. § 4A1.3). *See also Alimehmeti*, No. 16 Cr. 398 (PAE) (S.D.N.Y), Dkt. 133 at 16 ("The Second Circuit has, time and again, in its words expressly upheld the lawfulness of the terrorism enhancement. And the Circuit has also specifically found that the Sentencing Commission had a rational basis in fashioning that guideline to increase both a defendant's offense level and his criminal history category. It has reasoned to the latter that even terrorists with no criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.") (internal quotations and citations omitted).

This is not an "exceptional case." Rather, courts have consistently applied the terrorism enhancement where a defendant, like this defendant, does not have any known criminal history. *See, e.g.*, *United States v. Bradley & Muthana*, No, 21 Cr. 277 (PAE) (S.D.N.Y.), Dkt. 112 at 6 (finding that terrorism enhancement applied to two defendants without any known criminal history who attempted to travel to Yemen to join ISIS); *Ullah*, No. 18 Cr. 16 (RJS) (S.D.N.Y.), Dkt. 116 at 10-13 (finding that terrorism enhancement applied to defendant without any known criminal history who attempted to carry out lone-wolf attack in the name of ISIS by detonating a pipe bomb in a subway station in Manhattan); *United States v. Raishani*, No. 17 Cr. 421 (RA) (S.D.N.Y.), Dkt. 62 at 4 (finding that terrorism enhancement applied to defendant without any known criminal history who attempted to leave the United States to join ISIS); *Rahimi*, No. 16 Cr. 760 (RMB) (S.D.N.Y.), Dkt. 207 at 20 (finding that terrorism enhancement applied where defendant without

any known criminal history carried out terrorist bombings in Chelsea neighborhood of Manhattan and New Jersey).

### III.   A Sentence of at Least 600 Months' Imprisonment and the Imposition of Lifetime Supervised Release is Appropriate

The defendant's conduct in this case was reprehensible and requires a lengthy term of incarceration of at least 600 months' imprisonment. After plotting to kill as many military-aged men who worked for the U.S. Government as possible, the defendant violently used a machete to attempt to kill three NYPD officers near a security checkpoint at the New Year's Eve Times Square celebration. This bloody display was not enough, however—the defendant viewed his attack as unsuccessful because he did not kill any of the officers and he did not die himself and achieve martyrdom. (PSR ¶ 35.) The defendant's depraved crimes caused extraordinary harm, and the sentence imposed must reflect the seriousness of this conduct and serve to deter the defendant and others similarly situated. For all of these reasons, the Court should impose a sentence of at least 600 months' imprisonment.

#### A.   The Nature and Seriousness of the Defendant's Conduct and the Need for Just Punishment Warrant a Sentence of at Least 600 Months' Imprisonment

The seriousness of the defendant's actions, and the need to impose just punishment, warrant a significant sentence of incarceration in this case, which would be satisfied by a sentence of at least 600 months' imprisonment. *See* 18 U.S.C §§ 3553(a)(1), (a)(2)(A).

The defendant's crime was exceedingly serious. On New Year's Eve in 2022, in the midst of what was supposed to be a festive occasion, the defendant, inspired by hatred, purposefully tried to murder three NYPD officers in one of the most depraved and violent ways imaginable—by taking a machete to each of their heads. Each of the Victim Officers has experienced extensive and ongoing physical and mental damage as a result of the defendant's attack. It is nothing short of

41

miraculous that the defendant did not kill anyone, despite his extensive planning and desires. As a result of the swift actions of law enforcement, including the actions of Officer-2, the attack was disrupted and lives were saved. And it is particularly fortunate that the defendant's attempts to obtain a gun—either from the dark web or from one of the Victim Officers—were unsuccessful—as it is almost unfathomable the havoc he would have wrecked with access to a more destructive and dangerous tool. But the weapon he was able to employ was tragically sufficient to forever change the lives of his victims, and he should receive no mitigation at sentencing for his failure to murder, rather than injure and terrorize, his victims.

The PSR provides a glimpse of the enduring physical and emotional toll of the defendant's attack. Officer-1's skull was fractured, he received more than a dozen stitches, he was out-of-work for months, and he has weekly headaches to this day; Officer-2 still suffers from back pain and will likely need surgery, he was out-of-work for months, and he constantly relives the trauma of the attack; and Officer-3—who said "everything that has happened has changed my life" and may "end [his] career—required seven stitches on his forehead and continues to suffer what will likely be lifelong damage, including constant ringing in his ears, migraines, degraded speech and memory, and PTSD. (PSR ¶¶ 40-42.) All of this evidence demonstrates the overwhelmingly serious nature of the defendant's crimes and the unimaginable harm he caused to each of his victims.

And it was not just the Victim Officers who have suffered because of the defendant. His actions also had an impact on the civilians who bore witness to his ferocious attempts to murder three NYPD officers. Witness-1's victim impact statement describes the difficulty of knowing how to comfort his young daughter, Witness-2, after they saw the defendant's brutal attack. He also describes how the defendant's actions have affected Witness-2—who almost unfathomably also

was present in the aftermath of Sayfullo Saipov's deadly terrorist attack in lower Manhattan on October 31, 2017. The defendant's efforts to kill NYPD officers—who put their lives on the line for those in this community every day—is abhorrent enough, and itself deserves the sentence the Government now seeks. But, as illustrated above, the defendant's attack has also taken a toll on people in the community who were simply trying to spend time with loved ones and friends during a national holiday without fear that tragedy might befall them. While the defendant may now express remorse to the Court, with his own future hanging in the balance and everything to gain through such self-serving claims, the victims continue to suffer; nothing the defendant now says can take away how the defendant's actions have altered their lives. The attempted murder of each of the Victims Officers, and the pain suffered by those who love them and those who watched the attack, warrant a sentence of at least 600 months' imprisonment, standing alone.

Beyond the act itself, the motivation for the defendant's attack is reprehensible and merits a significant sentence. The defendant offered his life to support radical extremism, in order to become a martyr. Although now, more than a year after the attack and in an effort to gain a significantly below-Guidelines sentence, the defendant attempts to place his radicalization in the context of family struggles, his actions and words in the days leading up to and immediately after the attack are a better indication of his motivation than his post-hoc efforts at leniency. The defendant made crystal clear that the motivation for his attack was radical extremism, and the desire to cause terror and carnage. And the defendant's attack was not aberrational conduct or a momentary lapse in judgment. Instead, it evidences a dangerous and frightening level of planning and effort to hide his planned actions. In the days leading up to the attack, the defendant used an encrypted application and secure browser to plan his attack and further consume extremist literature. (Ex. A.). And, immediately before the attack he drew inspiration from a video featuring

Usama bin Laden's mentor, urging him to fight the mushrikeen, that is, polytheists. The defendant's post-arrest statements, not his self-serving claims at sentencing, are further indication of his motivations for committing the attack. While lying in a hospital bed with serious injuries he himself suffered in the attack, the defendant proudly declared that his goal was to kill as many men of military age as possible; that no one can work for the U.S. Government and be a true Muslim; and that he wanted to die in the attack to achieve martyrdom. These are the words and actions of a terrorist. A terrorist who was willing to die and leave his family behind, and who was proud that he had attacked innocent people in New York City. There can be no leniency for such a heinous crime. The defendant's conduct deserves a sentence of at least 600 months in prison.

### B.  The Defendant's Personal Circumstances Do Not Support a Sentence of Less Than 600 Months' Imprisonment

The Government's recommended sentence, which is well below the applicable Guidelines sentence, would also take into account certain mitigating factors raised by the defense, including the defendant's purported mental health issues and age.

Sadly, it is not uncommon for radicalized individuals, many of whom are young, to suffer from mental health issues. *See*, *supra*, page 38-39, 48. Here, while the Government has no reason to dispute that the defendant has mental health issues, in the face of the indisputably grave nature of the defendant's crimes, the immense harm he has caused, the need for deterrence and just punishment, and the risk that the defendant continues to pose to the community, the extreme variance of the 120-month sentence proposed by the defense is not warranted. At his plea allocution, the defendant acknowledged that he tried to murder the three Victim Officers fully understanding what he was doing. The defendant's asserted mental health issues simply cannot excuse his conduct.

In this regard, the Court should reject the defendant's argument that he poses little risk to the community. (Def. Mem. at 21.) *First*, while Dr. Schouten's report relays the defendant's descriptions of some of the defendant's behavior leading up to the attack, it critically glosses over several key points—for example, how and why the defendant chose to attack, in particular, military-aged men who worked for the U.S. Government; that the defendant said "Allahu Akbar" when he attacked them; that he tried to grab one of the officer's guns; and that he intended to be a martyr. Nor does it appear that any of the experts were even provided with the pages and pages of searches that the defendant conducted using an encrypted application and secure search function that underscore the premediated and extremist nature of his attack—numerous searches about, for example, how to join al Qaeda, waging jihad, the New York City's New Year's Eve celebration, and buying a gun on the black market in New York City. Rather, their assessments are based on several interviews of the defendant, during which, of course, the defendant was incentivized to paint himself in the best possible light; mental status examinations; psychological measures that the defendant self-reported; select law enforcement and court records; interviews with his family members and a treating physician; his medical records; chats between the defendant and his mother and two pages from his journal; notes from his mitigation specialist; and a review of his school records. (Ex. A to Def. Mem. (Schouten Report), at 4; Ex. B to Def. Mem. (Caccappolo Report), at 1-2.) Without having the information at their disposal to fully understand the risk of violence that the defendant posed to his community prior his arrest in this case, these experts' conclusion that the defendant is of low risk to the community requires a healthy dose of skepticism. (Ex. A to Def. Mem. (Schouten Report), at 9-10; Ex. B to Def. Mem. (Caccappolo Report), at 10.)

*Second*, the defendant's experts state that the defendant continues to hear "popping noises" and is seeing a "spirit"—purported delusions that he previously claimed guided his behavior and

could do so again. (Ex. B to Def. Mem. (Caccappolo Report), at 5.) Thus, if anything, these supposed delusions could be seen as aggravating and supporting the need to prevent the defendant from committing future criminal conduct.

*Third*, the defendant has asserted that the BOP has been providing him with a strict treatment regimen, which has enabled him to, in his words, make "significant progress while in custody." (Def. Mem. at 12.) This indicates that the BOP is more than equipped to continue providing him with treatment during his period of incarceration.

This Court should also approach with skepticism the defendant's assertion that he has been rehabilitated and that his conduct while incarcerated require a large deviation from the Guidelines. (Def. Mem. at 21-22, 28.) Notably, the defendant's refusal even to admit that he was radicalized *in the first place* (Def. Mem. at 1)—despite all of the evidence to the contrary—calls into question the full extent of the defendant's acceptance of responsibility, full remorse, and risk of recidivism. *See, e.g.*, *United States v. Cox*, 458 F. App'x 79, 83-84 (2d Cir. 2012) (noting approvingly that the district court had found heightened risk of recidivism based, in part, on defendant's inability to completely accept responsibility). Indeed, this claim should give the Court significant pause about the defendant's claims today regarding why he committed his attack and his supposed changes over the last 16 months. The defendant's actions clearly indicate that he was radicalized. It is hard to imagine a clearer sign than listening to a speech from bin Laden's mentor in the moments before an attack—as do his words after his attack—including his admission that he intended to die in his attack and thought his attack unsuccessful because he did not kill any officers and was not himself killed. This claim, put simply, is troubling, and speaks to the need for a very serious sentence in this case. Additionally, no serious mitigating weight can be borne here by the fact that the defendant did what was plainly required of him—that is, behaving himself in prison—and that he

helped an inmate tried to commit suicide, including by calling for correctional officers. While, in the BOP's words, this was "pro-social behavior" (Def. Mem. at 22), it simply does not mitigate the defendant's heinous conduct in this case.

The defendant also argues that his age is a mitigating circumstance. (Def. Mem. at 23-26.) Sadly, the only thing the defendant's age proves is that he is squarely in line with the ages of other young, male extremists that have attacked or planned attacks in this country and beyond. *See, e.g.*, *Bradley*, No, 21 Cr. 277 (PAE) (S.D.N.Y.) (18-year-old defendant attempted to travel to Yemen to join ISIS after initially planning to attack soldiers at the United States Military Academy in West Point, New York or to Reserve Officer Training Corps cadets); *Alimehmeti*, No. 16 Cr. 398 (PAE) (25-year-old defendant who supported ISIS, among other things, acquired tactical knives, handcuffs and equipment indicative of efforts to prepare for an attack in New York City); *El Bahnasawy*, No. 16 Cr. 376 (RMB) (S.D.N.Y.) (19-year-old defendant who conspired to carry out terrorist attacks on behalf of ISIS in New York City); *United States v. Jabarah*, No. 02 Cr. 1560 (BSJ) (S.D.N.Y.) (19-year-old defendant who conspired to bomb U.S. embassies in Singapore and the Philippines on behalf of Qaeda); *United States v. Tsaernaev*, No. 13 Cr. 10200 (GAO) (D. Mass.) (17-year-old defendant detonated bombs at the 2013 Boston Marathon, killing three people and injuring more than 200 people). The defendant's attack was methodical, premeditated, and cold-blooded. The defendant was radicalized and attempted to kill three NYPD officers in an effort to become a martyr. He consumed extremist literature of the type that was found in the aftermath of the attack. He used the dark web to research how to join terrorist organizations such as al Qaeda and how to properly conduct jihad. He was not deterred by the FBI interview weeks before the attack; instead, he turned his attention to killing people here in the United States rather than joining al Qaeda or the Taliban abroad. The defendant's age simply cannot bear the mitigating weight that

the defense assigns it, in light of the defendant's serious conduct. While factors such as age may be "consider[ed] . . . in deciding whether a variance is warranted and in determining the extent of any variance, [the sentencing court] should take into account the 'discouraged' status of these factors." *United States v. Robinson*, 669 F.3d 767, 776 (6th Cir. 2012) (citing *United States v. Borho*, 485 F.3d 904, 913 (6th Cir. 2007) (quotations marks omitted)); *see also United States v. Saidakhmetov*, No. 15 Cr. 95 (WFK), 2018 WL 461516, at *2 (E.D.N.Y. Jan. 18, 2018) (imposing statutory maximum sentence of 15 years for youthful defendant who had sought to travel to join ISIS); *United States v. Juraboev*, No. 15 Cr. 95 (WFK), 2017 WL 5125523, at *2 (E.D.N.Y. Nov. 1, 2017) (same). If anything, the defendant's youth increases the risk that he poses to public safety; if he is in not incapacitated for a lengthy amount of time, his age will make him fully capable of harming others in support of radical Islamic ideology.

In addition, the defendant' overly relies on troubling aspects of his upbringing. (Def. Mem. 2-6.) While the defendant has encountered difficulties, and the Court can consider them in sentencing the defendant, he has also benefitted from certain advantages, including apparent financial stability and family members that love him. Many people do not have these advantages, and they do not turn to crime, let alone to trying to murder three innocent NYPD officers.

Finally, the defendant points to his conditions of confinement while he has been detained pretrial at the Metropolitan Detention Center ("MDC"). (Def. Mem. at 27-28.) To the extent that the defendant's argument rests on lockdowns and quarantines, while BOP facilities have assuredly had challenges, including lockdowns, "lockdowns are a routine fact of life for incarcerated defendants and are hardly extraordinary." *United States v. Pinto-Thomas*, 454 F. Supp. 3d 327, 331 (S.D.N.Y. 2020); *see also United States v. Mateo*, 299 F. Supp. 2d 201, 208 (S.D.N.Y. 2004) (courts typically grant variances or departures only where "the conditions in question [were]

extreme to an exceptional degree and their severity [fell] upon the defendant in some highly unusual or disproportionate manner."). The Court, of course, may consider the conditions of incarceration in determining the defendant's sentence, but the dramatic variance the defendant seeks on that basis is wholly inappropriate when measured against the severity of his conduct, as well as the other 3553(a) factors. *See United States v. Woodberry*, No. 22-433, 2023 WL 3573759, at *2 (2d Cir. May 22, 2023) (sentence within District Court's discretion when it "declined to vary further" than "a modest downward variance" in light of custodial conditions during pandemic "because it determined that the mitigating factors in [defendant's] favor were offset by several aggravating factors").

The Government disagrees with the defendant's minimization of his conduct and failure to address squarely the nature of his brutal attacks. Notwithstanding the aspects of the defendant's personal history and characteristics raised by the defense, such as his age and asserted mental health issues, a substantial sentence of at least 600 months' imprisonment is warranted here.

### C.  A Sentence of at Least 600 Months' Imprisonment Will Avoid Creating Unwarranted Sentence Disparities

A sentence of at least 600 months is reasonable and warranted to avoid creating sentencing disparities across comparable terrorism cases. Throughout the United States, terrorism defendants who have attacked or attempted to attack innocent people in our community have frequently received substantial sentences, often the maximum term allowed by statute. For example, in *Ullah*, No. 18 Cr. 16 (RJS) (S.D.N.Y.), the 31-year-old defendant, who was diagnosed with depression, attempted to carry out a lone-wolf pipe bomb attack in the Port Authority subway in support of ISIS. The defendant was convicted, after trial, of material support and firearms offenses. At sentencing, defense counsel argued that the defendant was "reformed," "remorseful," and

"disavowed allegiance to radical and violent ideals and organizations," Dkt. 116 at 27. In

sentencing the defendant to life imprisonment, the statutory maximum, then-District Court Judge

Sullivan stated the following:

> Your personal experience is important but your conduct here is truly heinous. I
> mean this is about as bad a crime as there is. This was not a crime of passion, this
> was not an exercise in bad judgment. This was not a crime of violence motivated
> by greed like a robbery or drug dealing or something. This is not any of those things.
> This was a calculated premeditated decision to kill as many people as you could,
> injure others, all in the name of an organization that is dedicated to spreading terror.
> That's what it was. And it seems to me that the enormity of that crime eclipses the
> other positive aspects of your character.

* * *

> So, this is about as serious a crime as there is. Now, you ultimately failed in the
> execution. You didn't execute this as well as you might have – thankfully – but it
> doesn't make you less culpable. It doesn't make your intent any less sinister or,
> frankly, evil. I agree with [defense counsel], I don't think you are an evil man. I
> don't throw that word around lightly but this act was evil, this act was designed to
> kill people and hurt them without a thought as to what it was going do in their lives.
> So, I have to say, in terms of a just punishment, it seems to me that a life sentence
> is appropriate.

(*Id.* at 37-38.)

This is also the case where, as here, a defendant's attack was thankfully at least to some

extent thwarted as a result of law enforcement swift action. *See, e.g.*, *Melzer*, No. 20 Cr. 314

(GHW) (45-year sentence for defendant who planned attack on U.S. army for O9A); *Jabarah*, No.

02 Cr. 1560 (BSJ) (S.D.N.Y. Jan. 18, 2008) (life sentence for al Qaeda operative who conspired

to bomb U.S. embassies in Singapore and the Philippines); *United States v. Reid*, No. 02 Cr. 10013

(WGY) (D. Mass. Jan. 30, 2003) (life sentence for al Qaeda supporter who attempted to detonate

shoe bomb during international flight); *United States v. Murad*, No. 93 Cr. 180 (LAK) (S.D.N.Y.

May 15, 1998) (life sentence for al Qaeda operative who participated in plot to place bombs on

airliners bound for United States from Asia); *see also United States v. Oussama Kassir*, No. 04 Cr.

356 (JFK) (S.D.N.Y. Sept. 15, 2009) (life sentence for al Qaeda supporter who attempted to establish a jihad training camp in the United States and disseminated bombmaking manuals).

The defendant's suggestion that, contrary to the Guidelines, the statutory maximum sentence is not appropriate or would be somehow unusual is simply wrong. Indeed, even where defendants engaged in lesser conduct, courts have also imposed maximum sentences in terrorism-related cases. *See, e.g.*, *Clark*, No. 20 Cr. 76 (NRB) (S.D.N.Y.) (defendant sentenced to statutory maximum of 20 years' imprisonment for and exhorting other participants in chatrooms to commit lone-wolf attacks in United States, disseminating large quantities of pro-ISIS propaganda and terrorist-attack training manuals in online chatrooms, and participating and administering chatrooms); *Raishani*, No. 17 Cr. 421 (RA) (S.D.N.Y) (imposing 300-month sentence, the statutory maximum, for defendant who attempted to leave the United States to join ISIS but was stopped by law enforcement ); *Alimehmeti*, No. 16 Cr. 398 (PAE) (S.D.N.Y.) (imposing concurrent sentences of 240 and 264 months' imprisonment, where the Guidelines range was 360 to 540 months' imprisonment (the statutory maximum), for defendant who radicalized, supported ISIS, and attempted to facilitate the travel of an undercover agent to join ISIS overseas); *United States v. Farhane, et al.*, No. 05 Cr. 673 (LAP) (S.D.N.Y.) (imposing 300-month sentence, where the statutory maximum was 360 months' imprisonment, for defendant who conspired to provide material support to al Qaeda by providing medical services to al Qaeda personnel); *United States v. Badawi, et. al*, No. 15 Cr. 60 (C.D. Cal.) (two defendants each sentenced to statutory maximum of 15 years' imprisonment for conspiring to provide material support to ISIS, where one defendant was arrested at airport attempting to travel overseas to join ISIS and the other defendant had supported and assisted his travel); *United States v. Pugh*, No. 15 Cr. 116 (NGG) (E.D.N.Y.) (defendant sentenced to statutory maximum of 15 years' imprisonment for attempting to travel to

51

Syria to join ISIS); *United States v. Alaa Sadeh*, No. 15 Cr. 558 (SDW) (D.N.J.) (defendant sentenced to statutory maximum of 15 years' imprisonment for assisting another individual to travel to join ISIS overseas); *United States v. Zea*, No. 13 Cr. 72 (SJF) (E.D.N.Y.) (defendant sentenced to statutory maximum of 15 years' imprisonment for attempting to travel to Yemen to join AQAP); *see also United States v. Kourani*, 6 F. 4th 345, 357-59 (2d Cir. 2021) (affirming district court's sentence of 40 years' imprisonment for defendant's conviction of various offenses, including providing and conspiring to provide material support to Hizballah, in part because sentence "simply reflects Congress' judgment as to the appropriate national policy for such crimes" (alterations and internal quotation marks omitted)); *accord Stewart*, 590 F.3d at 166 n.4 (Walker, J., concurring in part and dissenting in part) ("Most of these courts [in material support cases] chose the maximum material support sentence available to them under federal law . . .").

The defendant's request for a 120-month sentence is completely out of line with the cases cited above and utterly fails to account for the gravity of the defendant's crime. In this regard, a recent decision from the Second Circuit, which is cited by the defendant, is instructive. (Def. Mem. at 18.) In *Ceasar*, 10 F.4th 66 (2d Cir. 2021), the defendant "expressed her support for ISIS, encouraged others to join ISIS abroad, and helped individuals in the United States contact ISIS members overseas," who "then facilitated U.S.-based ISIS supporters' travel to ISIS-controlled territory." *Id.* at 68. The defendant ultimately pleaded guilty to one count of conspiring to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B, and one count of obstruction of justice, in violation of 18 U.S.C. § 1512(c)(1). *See id.* at 68-69. The defendant's Guidelines range was 360 to 600 months' imprisonment, but the court imposed a sentence of just 48 months' imprisonment (approximately 13% of the bottom of the Guidelines range). *See id.* at 69. On appeal by the Government, the Second Circuit vacated the sentence and

remanded for resentencing. *See id.* at 70. The court's decision was based on several grounds, one of which was that the court "placed more emphasis on Ceasar's need for rehabilitation than that sentencing factor could bear," and that "in comparison with sentences for similar terrorism crimes, [the defendant's] sentence of 48 months' imprisonment was shockingly low and unsupportable as a matter of law." *Id.* at 69, 71. In reaching that determination, the Second Circuit analogized to two other cases in which it had vacated a sentence and remanded for resentencing based on substantive unreasonableness: *Stewart*, 590 F.3d 93 (2d Cir. 2009), in which the defendant had a Guidelines range of 360 months' imprisonment, but was sentenced to only 28 months' imprisonment; and *Mumuni Saleh*, 946 F.3d 97 (2d Cir. 2019), in which the defendant had a Guidelines range of 85 years' imprisonment, but was sentenced to only 17 years' imprisonment. *See Ceasar*, 10 F.4th at 80-82. Notably, none of the cases cited on page 26 of the defendant's brief in support of its argument for a 120-month sentence involve terrorism.

### D. A Sentence of at Least 600 Months' Imprisonment is Necessary to Afford Adequate Deterrence, to Promote Respect for the Law, and to Protect the Public

A sentence of at least 600 months' imprisonment is also necessary to adequately deter criminal conduct—in this case, terrorism aimed at harming innocent people and American interests—to protect the public from further crimes of the defendant, and to promote respect for the law prohibiting such destructive conduct. *See* 18 U.S.C. § 3553(a)(2)(A)-(C).

The defendant must be incapacitated for a substantial amount of time to protect the public. *See, e.g.*, *United States v. Ressam*, 679 F.3d 1069, 1089-90 (9th Cir. 2012) (en banc) (finding sentence reduction of 43 years, or a 2/3 reduction, was unreasonable in a terrorism case, especially where the defendant's release age would be 51 and "[m]ost people are sufficiently active and capable at age 51 to do considerable damage, if they are so inclined"). Similarly, in *United States*

*v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011) (citations omitted), the Eleventh Circuit explained that, ["a]lthough recidivism ordinarily decreases with age, we have rejected this reasoning as a basis for a sentencing departure for certain classes of criminals, namely sex offenders. We also reject this reasoning here. "[T]errorists[], [even those] with no prior criminal behavior[,] are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." A ten-year sentence does not protect the public from the defendant's violent tendencies.

The need for deterrence is also of critical importance here. Terrorism is a crime with high recidivism rates and rehabilitation is notoriously difficult for those convicted of it. *See Meskini*, 319 F.3d at 91-92 (noting the link between "the difficulty of deterring and rehabilitating" terrorists and the conclusion that "terrorists and their supporters should be incapacitated for a longer period of time"); *see also Stewart*, 590 F.3d at 181 ("In no area can the need for adequate deterrence be greater than in terrorism cases, with their potential for devastating loss of innocent life.") (Walker, J., concurring). In this case, there is an overwhelming need for both individual and general deterrence.

Individual deterrence is particularly necessary here for several reasons. *First*, it is clear that the defendant's prior contact with the criminal justice system did not deter him from engaging in a brutal terrorist attack. Despite intervention by the FBI in mid-December 2022—during which the defendant hid the extent of his radicalization (*e.g.*, not revealing his intention to harm innocent people in the United States)—the defendant proceeded, two weeks later, to try to murder three NYPD officers. *Second*, the defendant's willingness to take up arms against his country and kill fellow citizens, and his aspiration to commit the ultimate sacrifice to martyr himself in service of terrorist ideology, all support the conclusion that specific deterrence and incapacitation are crucial.

54

*Third*, while the defendant now claims, at least in part in an effort to win leniency at sentencing, that he has denounced radical ideology, there is little reason to fully credit that claim. The defendant was plainly radicalized a year and a half ago when he tried to murder three police officers. The defendant is a young man, who is still fully capable of extreme and deadly violence. Simply put, the risk is too great to accept the defendant's claim that he has renounced extremist ideology. His words and actions on December 31, 2022 show that the defendant is dangerous and in need of significant individual deterrence. Further, the fact that the defendant does not have a prior criminal record (*see* Def. Mem. 22-23)—a fact that is not unusual in the context of a young, radicalized defendant who carries out a terrorist attack—does not in any way moderate the need for deterrence in this case. While the defendant does not have any prior convictions, his criminal history category is VI as a result of the application of the terrorism enhancement, which reflects the Sentencing Commission's sound assessment of the high likelihood of recidivism, and the corresponding need for deterrence, in terrorism cases such as this one—an assessment the Second Circuit has endorsed. *See Meskini*, 319 F.3d at 92 (explaining that "[c]onsidering the serious dangers posed by all forms of terrorism, the Guidelines are in no way irrational in setting the default for criminal history at a very high level").

General deterrence is exceedingly important in this case as well. "General deterrence is essential here so that the severe consequences of choosing terrorism are apparent to all who might consider it." *United States v. Babafemi*, No. 13 Cr. 109, 2021 WL 1210313, at *6 (E.D.N.Y. Mar. 31, 2021). In imposing a sentence of 240 months' imprisonment on a terrorism defendant in *Clark*, Judge Buchwald explained: "[O]f enormous importance here is that the sentence of [the defendant], even if it were not necessary to deter him, would be justifiable for the reasons of general deterrence. *The message must be loud and clear. Provide or attempt to provide material*

*support and resources to a foreign terrorist organization and you will spend a very long time in jail.*" No. 20 Cr. 76 (NRB), Dkt. 31, Tr. 30-31 (emphasis added). It is vital for our country's national security that other young people who reside in the United States be deterred from choosing to follow a path similar to this defendant and engaging in such devastating conduct. It is important for those who are considering engaging in violent terrorist acts to know that the consequences for such conduct are exceedingly serious. And it is important for the public to know that those who engage in violent terrorist acts will face serious punishment preventing them from causing harm to society. The defendant tried to kill three NYPD officers. A sentence of at least 600 months' imprisonment would be appropriate to serve the pressing need for general deterrence of such terrorism offenses.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should sentence the defendant to at least 600 months' imprisonment and a lifetime term of supervision, as such a sentence is sufficient but not greater than necessary to comply with the purposes of sentencing pursuant to 18 U.S.C. § 3553(a).[14]

Dated: New York, New York
      May 3, 2024

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:        /s/
           Matthew J.C. Hellman /
           Sarah L. Kushner / Kaylan E. Lasky
           Assistant United States Attorneys

---

[14] The Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).